(86 South. 880)

MONTGOMERY ENTERPRISES et al. v. EMPIRE THEATER CO. (3 Div. 446.)

(Supreme Court of Alabama. June 30, 1920. Rehearing Denied Oct. 21, 1920.)

**1. Insurance ⬉146(3)—Forfeiture clauses construed strictly.**

It is a rule of construction of printed blank contracts, as insurance policies, that they be construed with care and caution in the enforcement of forfeiture clauses contained in the printed form, but the courts are not at liberty to make new contracts for the parties where the language is unambiguous, and they are susceptible only of a single reasonable construction.

**2. Contracts ⬉164—Instruments constituting single contract to be construed as one.**

Two instruments constituting contracts between a theater company and a motion picture company engaged in the business of distributing films, which together evidenced one contract, are to be construed as one transaction, with reference to each other.

**3. Contracts ⬉211—Whether time of essence determinable from' instruments constituting single contract construed together.**

Whether time is of the essence of a contract made up of two written instruments is determined from · the two instruments when considered as one, having in view the circumstances of the parties, the object each had in view, and the subject dealt with.

**4. Contracts ⬉170(1)—Construction by parties controlling of meaning.**

If a contract is of a doubtful import as to any of its provisions, the practical construction put by the parties on such provision is controlling of its meaning and must often prevail over its literal meaning.

**5. Contracts ⬉153—Legal construction preferred.**

A contract will be construed so as to make it legal rather than illegal.

**6. Customs and usages ⬉13—Trade custom known to parties incorporated in contract.**

A trade custom as to the subject and objects of the contract known to the parties as prevailing in the community where it is executed and to be performed is by implication incorporated in the contract respecting the subject-matter of the custom.

**7. Contracts ⬉215(1)—Contract for motion pictures construed to run for one year.**

Contract between theater company and motion picture company engaged in business of distributing films, in view of the surrounding circumstances of the parties and the object in view, if time was of its essence, held construed by the parties to run for approximately one year, having been executed September 7, 1918, expiring in November, 1919.

**8. Injunction ⬉130—Date of expiration of contract and of its effective cancellation questions of law for court.**

The date of expiration of contract to furnish theater company with motion pictures and of effective cancellation thereof by a motion picture company distributing films are questions of law for the determination of the court in suit by the theater company to enjoin another amusement company from exhibiting a first run film of a particular artist covered by the contract.

**9. Contracts ⬉250—Motion picture company distributing films held not to have canceled theater company's contract.**

Motion picture company, engaged in business of distributing films, which contracted with a theater company to furnish first run of films featuring a particular star, held not to have canceled the contract with the theater company for the reasons provided in the contract.

**10. Trade-marks and trade-names ⬉69—Amusement company held chargeable with knowledge of plaintiff's contractual rights to first run of films featuring star.**

Defendant amusement company and its manager, sued by plaintiff theater company to enjoin them from using the first run of a film featuring a particular star, covered by the theater company's contract with a motion picture company, held chargeable with knowledge of such facts as to have informed them or put them on inquiry as to plaintiff theater company's contractual rights with relation to first run of films featuring such star.

**11. Trade-marks and trade-names ⬉68—Plaintiff's contract right to exhibit first run of moving picture films may not be infringed by others with notice.**

A motion picture company engaged in the business of distributing moving pictures having granted to a theater company by contract the exclusive privilege of showing a picture featuring a certain star at its theater in its city before exhibition of such film in other theaters in the city, the right was a valuable one secured to the theater company under the contract, and other theaters in the city could not legally exhibit the same film in disregard of the theater company's contract rights of first run after notice or knowledge of such rights.

---

⬉For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**12. Trade-marks and trade-names ⊂⊃97— Remedy at law against violation of right first to exhibit motion picture not adequate.**

Theater company which, under contract with a motion picture company engaged in the distribution of films, had the right to make the first exhibition in its city of films featuring a particular star, *held* without adequate remedy at law by way of statutory action of detinue for recovery of a film in specie to prevent exhibition of the film by an amusement company which contracted for such film with the motion picture company with notice or knowledge of the plaintiff theater company's rights.

**13. Injunction ⊂⊃114(3)—Court may restrain first run exhibition in violation of plaintiff's contract rights with foreign company not made a defendant.**

Under Code 1907, § 3054, court trying suit by theater company to enjoin amusement company from exhibiting first run of film featuring certain star, in violation of theater company's right under contract with a motion picture company not made a party, *held* vested with jurisdiction to enjoin exhibition of the picture by defendant amusement company; jurisdiction being acquired from the fact that the personal property of the picture company was in possession of the resident defendant, the amusement company, which was exhibiting it when bill was filed.

**14. Trade-marks and trade-names ⊂⊃89— Company entitled to first run film could enjoin distributor or person showing first run.**

A theater company, having contracted with a motion picture distributor for first run of films featuring a certain star, could enforce its remedy in equity by injunction either against the motion picture company which violated such contract by permitting the amusement company to show a first run of such star or against the amusement company alone.

**15. Injunction ⊂⊃191 — Temporary injunction not made permanent without compliance with statutes providing notice by publication.**

Temporary injunction against a motion picture distributor in favor of a theater company to protect its rights in the first run of films featuring a certain star will not be made permanent without compliance with the statutes providing due notice by publication to such a nonresident owner, as the motion picture company whose personal property is the subject of suit and the object of contract.

Appeal from Circuit Court, Montgomery County; W. L. Martin, Judge.

Suit by the Empire Theater Company against the Montgomery Enterprises and others to enjoin the production of the first run of moving picture films. From decree overruling demurrers to the bill, respondents appeal. Affirmed.

The bill was filed by the Empire Theater Company, a corporation, operating a theater for the exhibition of moving pictures for a reward in a city of the county where the bill was filed. One of the defendants, Select Pictures Corporation of Atlanta, Ga. (the state of its incorporation being averred as unknown), is engaged in the business of "distributing moving picture films." Another defendant, Montgomery Enterprises, an Alabama corporation, is engaged in the like business as complainant and in the same city, Montgomery, Ala. R. B. Wilby is averred to be a resident of, or to have his principal place of business in, Jefferson county, Ala., and to be the state manager of defendant Montgomery Enterprises.

The bill avers that on September 7, 1918, complainant entered into a contract with Select Pictures Corporation for the furnishing of moving pictures of the persons named in the contract—of eight photoplays for the times and on the terms indicated; that five of said pictures were furnished thereunder, in all of which the artist indicated performed, the last picture being furnished for exhibition on September 17 and 18, 1919; that, though complainant has fully performed its part of the contract, Select Pictures Corporation attempted to cancel the contract on September 16, 1919, by writing a letter purporting to be a cancellation in accordance with the eighth paragraph of the contract. The reporter will set out this and other pertinent parts of said contract. It is averred that the recitals of said letter of attempted cancellation were such as that complainant naturally concluded that some of the conditions mentioned in paragraph 8 of the contract had arisen which placed it without the power of Select Pictures Corporation to furnish other films in which the artist in question performed.

The bill further avers that the five pictures secured by complainant were supplied as "first runs" that had not been previously exhibited by others in the city of Montgomery; that the "first run" of a picture is a matter of great importance to an exhibitor, drawing, as it does, greater patronage; that the sum of $150 a picture, the amount agreed upon in the contract to be paid Select Pictures Corporation, "was adequate compensation and a reasonable charge for the use of the said film in the city of Montgomery for the privilege of exhibiting said films on their first exhibition, or what is known to the trade as the 'first run,' in said city of Montgomery by the said Empire Theater Company or any other theater."

It is further averred that it has been for a number of years the custom throughout the country, and in the city of Montgomery and vicinity, to make contracts similar to the one in question, in which the license to use or privilege of exhibiting the films was granted previous to the making or release of the film and "has always been understood by the said moving picture trade and per-

sons engaged therein, to grant to the exhibitor what is known as 'first run,' meaning thereby the right to exhibit such picture for the first time in a city or vicinity, for which the privilege or license was granted by the contract"; that this custom .was recognized and fully appreciated by .the several parties to the contract at the time of the making of the same; .that since its execution complainant had been accorded the right of exhibiting picture films in which the artist in question performed as a star as "first run" exclusively; that complainant's theater has become known as the one in the city of Montgomery which had the privilege of first exhibiting said artist's pictures; that on September 16, 1919, there remained to be shown as "first run" pictures two films in which said artist should perform as a star; that the letter of September 16th did not assign any of the reasons provided in said contract by virtue of and under which said Select Pictures Corporation had a right to cancel the contract, nor did it give complainant 10 days' notice of the cancellation thereof. It is further averred of Select Pictures Corporation's attempt to cancel said contract that it was in violation of complainant's rights under the contract, and that complainant did not learn until considerable time thereafter that none of the contingencies indicated in paragraph 8 of the contract had arisen or that Select Pictures Corporation had under its control any other picture films in which said artist performed as a star, until its agent proposed to lease the indicated picture in which said artist had performed as a star "at a proposed rental of $300"; that thereupon complainant demanded that said picture be furnished "under said contract at the rental of $150, as agreed upon therein, but that the said Select Pictures Corporation failed or refused to furnish * * * said moving picture," and complainant "had no means by which it could compel it to do so."

It is further charged that Select Pictures Corporation will furnish defendant Montgomery Enterprises the moving picture in question in which said artist performs as a star; that the latter has advertised in the city of Montgomery that it will exhibit said picture at its theater on Monday, Tuesday, and Wednesday, February 2d, 3d, and 4th, of the present week (the year 1920); that complainant learned of the proposed exhibition on the night of January 29, 1920, and on the next day in writing informed defendant "of its rights in the premises and gave it warning not to exhibit the same, * * * but notwithstanding said letter and said warning the said Montgomery Enterprises, a corporation, is preparing to begin the exhibition of said picture * * * during the early afternoon of this date"; that complainant had for several days been advertising for February 2, 1920, a picture of a different name in which the same artist performs as

a star, and if the Montgomery Enterprises is permitted to exhibit the other picture, it "will result in great loss of patronage and damage to your orator, serious and permanent and irreparable injury, for which there is no accurate method of measure capable of being used as evidence in the courts; that its loss of profits will be very large by reason of being deprived of the right to make a 'first run' of said picture; * * * and that said damages will not only be irreparable, but incapable of enforcement in a court of law."

It is further averred that, when the contract in question was executed, defendant Select Pictures Corporation assured complainant by letter that they had a contract with the artist in question, lasting through November, 1919.

The averments as to R. B. Wilby were that he was the state manager of Montgomery Enterprises; that he knew of complainant's contract with Select Pictures Corporation, advised and consulted with the manager of complainant theater in reference to contracts for films with a view to avoiding such conflict as has arisen on account of the matters averred, knew that complainant had a contract with said defendant and that complainant had been exhibiting the moving pictures in which said artist starred, and, while complainant could not "assert positively that the defendant Montgomery Enterprises, a corporation, or its state manager, R. B. Wilby, knew all the details of orator's contract with the Select Pictures Corporation, they did have enough knowledge of the same to put them on notice of orator's rights in the premises."

The prayer of the bill is that complainant is without any other remedy and asks for temporary injunction restraining the said defendant from exhibiting or otherwise displaying the designated moving pictures in Montgomery, Ala., until complainant shall have had first exhibition thereof, and that on a hearing said injunction be made perpetual. There was also prayer for general relief.

The bill was amended as follows:

" * * * That moving pictures come in a series of photographic films on reels, and that the films comprising said picture * * * were delivered to the defendant Montgomery Enterprises, Incorporated, on or before the 2d day of February, 1920, and on said date were in the city of Montgomery, Ala., and in the theater operated by said defendant known as the Strand Theater in said city."

To this amendment defendants Montgomery Enterprises and R. B. Wilby answered, admitting (to paragraph 8½):

That moving pictures come in a series of photographic films, "that there was delivered to the defendant Montgomery Enterprises, Incorporated, on or before the 2d of February, 1920, and on said date there was in the city

of Montgomery, Ala., one print of said photographic films of the picture" in question, "and was in the theater operated by said defendant and known as the Strand Theater in said city in that day, but they also aver that it was not the only print of said moving picture which the Select Pictures Corporation owned at the time, but none of the other prints of said picture were at that time or have since been in the city of Montgomery, Ala."

The contracts involved in the suit follow:

Select Pictures. Advance Payment Contract. Season 1918–1919.

Agreement made in triplicate this 7th day of September, 1918, between Select Pictures Corporation, a corporation, hereinafter called the "distributor," party of the first part, and Empire Theater Company, an exhibitor, operating the Empire Theater, at No. —— street, Montgomery, City, Ala., State, hereinafter called the "exhibitor," party of the second part, witnesseth:

Whereas, the parties hereto propose to enter into certain contracts under the above date whereby the distributor will grant to the exhibitor the license to exhibit certain series of photoplays at the above theater, upon certain days at stated prices; and

Whereas, as part of the consideration for the approval and execution of such contracts by the distributor the exhibitor has agreed to make an advance payment for photoplays deliverable under said contracts:

Now, therefore, in consideration of the premises and of the execution by the distributor of the aforesaid contracts with the exhibitor, relating to the series of photoplays respectively known by the following star series titles:

Clara Kimball Young,
Norma Talmadge,
Constance Talmadge,
Marion Davies,
Alice Brady

—the parties hereto do mutually agree as follows:

First. The exhibitor agrees to pay to the distributor, upon execution hereof, the sum of three hundred and seventy-five dollars, receipt whereof is hereby acknowledged, as an advance payment to be applied as hereinafter provided. The credit thus established in favor of the exhibitor shall, unless otherwise applied in accordance with the provisions hereof, be applied toward the payment of rentals of the last photoplays deliverable under said contracts.

Second. The distributor shall have the option and privilege of deducting from the credit established hereunder in favor of the exhibitor any sum or sums which may become payable to the distributor under any or all of said contracts, or the amount of any damage or liability, liquidated or unliquidated, which may be suffered or incurred by the distributor as the result of any breach by the exhibitor under any or all of said contracts or under this contract. It is understood, however, that any such deduction by the distributor from such credit shall not be construed as a waiver by the distributor of any default or breach by the distributor, or of any legal remedy of the distributor. In the event of any deduction, as aforesaid, from the credit thus established in favor of the exhibitor, the distributor may require the exhibitor upon five (5) days' notice by the former to the latter to make good the amount so deducted, and upon failure by the exhibitor to make good such amount within the period stated the distributor may at its option forthwith, by written notice, terminate any or all of said contracts, retaining at its option all sums remaining in its hands to the credit of the exhibitors as liquidated damages.

Third. The exhibitor agrees to play, in the order of delivery for exhibition, at least two of said photoplays during each and every period of one month commencing with the 1st day of November, 1918, and to play all of said photoplays on or before the expiration of one year from the date of exhibition of the first of said photoplays.

Fourth. Either party hereto may by notice by registered mail given to the other limit said contracts to one additional photoplay of each series respectively, and upon the delivery for exhibition of said additional photoplays said contracts will terminate with the same effect as if said photoplays were the last of the series respectively deliverable thereunder. In the event of such termination, the distributor shall apply the credit existing in favor of the exhibitor, so far as applicable, to the payment of said additional photoplays and shall credit or repay to the exhibitor an amount equal to the balance existing in favor of the exhibitor upon such termination.

Fifth. This agreement shall not be valid until approved in writing on behalf of Select Pictures Corporation, by its president, vice president, treasurer, secretary, or general manager; and no alteration hereof shall be valid except the same be in writing, and approved by one of the officers herein enumerated. The depositing for collection by the distributor of the check or other consideration tendered as advance payment under this agreement shall not be deemed in any way as acceptance of the contract by the distributor.

Select Pictures Corporation,
By A. S. Kane, General Manager.
Empire Theater Co.,
H. C. Farley, Mgr.
Recommended: Dated ——191—.
Frank Rogers.
By T. O. Tuttle, Manager.
Exhibitor's Copy.

Select Pictures. Contract for Photoplays Starring Norma Talmadge. Season 1918–1919.

S. C. No. ——.          Contract No. A 2015
Effective with Release No. 207.
Branch at Atlanta.

Agreement made in triplicate this 7th day of September, 1918, between Select Pictures Corporation, a corporation, hereinafter called the "distributor," party of the first part, and Empire Theater Company, an exhibitor, operating at the Empire Theater, at No. —— street, Montgomery, City, Ala., State, hereinafter called the "exhibitor," party of the second part, witnesseth: That, in consideration of the mutual covenants herein contained and of the advance payment contract of even date, the parties hereto agree as follows:

First. The distributor agrees that it will, dur-

ing the year commencing on or about the 1st day of September, 1918, release eight photoplays in which the above-named star shall enact the leading role; and it hereby grants to the exhibitor the license to exhibit one copy of each of said photoplays, at the above-named theater only, for two successive days, and the exhibitor agrees to pay for such license the sum of one hundred and fifty dollars per picture, such payments to be made at least seven (7) days before the date specified by notice to the exhibitor as hereinafter provided. Such license shall be specifically and solely for the exhibition of such photoplays at the above-named theater on the days specified in said notice to the exhibitor, and for no other purpose.

Second. The distributor shall give at least three weeks' notice to the exhibitor of the dates on which the latter shall be entitled to exhibit each of said photoplays in the theater aforesaid, and the exhibitor agrees to exhibit said photoplays on the dates designated only, and to charge a minimum actual admission fee of ten cents.

Third. The distributor agrees that it will use its best efforts to have a copy of the photoplay next to be shown by the exhibitor, at its nearest branch office, for delivery to the exhibitor, in time for the showing in the theater aforesaid, on the date stated in the notice hereinbefore referred to, but the distributor shall not be liable in any way for failure or delay in making deliveries of photoplays in accordance with the terms hereof, by reason of accident, strikes, fires, court orders, censor rulings, delays of any common carrier, or other causes beyond its control which may cause such delay or prevent or interfere with such showing. It is further understood that the failure of the producer of said photoplays to make or deliver them, or any of them, to the distributor, or of the above-named star to appear therein, or the failure of any prior exhibitor to return any photoplay to the distributor, in accordance with the agreement made between the latter and such exhibitor, shall each be deemed to constitute a cause beyond the control of the distributor within the meaning of this agreement.

Fourth. The exhibitor agrees to deliver to the local branch of the distributor, if there be such, or to the nearest proper express company, or to the fastest messenger service (with the container properly addressed for reshipment), the photoplays hereinbefore mentioned together with any appurtenances furnished to the exhibitor for temporary use, immediately upon the termination of the period fixed in said notice, for the exhibition of each of said photoplays. The exhibitor agrees that he will pay delivery charges both ways. If the exhibitor shall use or retain any photoplays delivered hereunder beyond the period stated in said notice, without the written consent of the distributor, or shall fail to redeliver or reship the same in accordance with the provisions hereof, or if any copy of a photoplay delivered to the exhibitor is run at any theater other than the one specified herein, in the interval between delivery thereof to the exhibitor and redelivery thereof to the distributor, the exhibitor shall forthwith pay to the distributor for such use, retention, failure, or improper use

twice the amount provided to be paid per day for such photoplay under this agreement, pro rata for each day of such use, retention, failure, or improper use, and shall hold the distributor harmless on account of any damage resulting therefrom.

Fifth. The distributor agrees not to use any advertising matter in connection with said photoplays except that which is purchased or leased from or approved by the distributor, nor except in connection with the showing thereof at the theater above specified, and only such newspaper advertising and publicity matter as shall adhere strictly to the form of announcement contained in advertising matter relating to such photoplay furnished by the distributor; to run photoplays as delivered without alteration, leaders, or trailers; and to advertise and announce each of such photoplays as a select picture.

Sixth. The exhibitor agrees to return all photoplays as delivered by the distributor in the same condition as they were received, reasonable wear and tear due to the proper use thereof excepted. The exhibitor shall pay to the distributor as liquidated damages the sum of eight cents for each lineal foot of the film destroyed or injured in any way in the interval between delivery thereof to the exhibitor and redelivery thereof to the distributor.

Seventh. In the event of the failure of the exhibitor to perform any of the terms and covenants of this agreement, the distributor shall not be required to make a further delivery or tender of photoplays hereunder.

Eighth. Inasmuch as the distributor is dependent for its ability to perform this contract upon the production of the photoplays above described, which may be prevented by the illness, injury, incapacity, death, or default of the artists, directors, and other persons or corporations engaged in producing the same, and inasmuch as the performance of this agreement on the part of the distributor may be prevented or delayed for various reasons beyond its control, it is recognized by both parties that it is necessary for the distributor to reserve the right of canceling this agreement. It is therefore specifically agreed that the distributor may, upon ten days' notice to the exhibitor, cancel this agreement. In the event of such cancellation both parties shall be relieved of all liability thereafter accruing hereunder.

Ninth. The exhibitor agrees not to assign this agreement without the written consent of the distributors.

Tenth. This agreement shall not be valid until approved in writing on behalf of Select Pictures Corporation, by its president, vice president, treasurer, secretary, or general manager; and no alteration hereof shall be valid except the same be in writing, and approved by one of the officers herein enumerated.

Eleventh. The exhibitor agrees that as long as the United States War Revenue Act of October 3, 1917, or any amendment thereof or any other act levying a footage tax on film shall remain or be in effect, the exhibitor shall pay to the distributor for all film received hereunder an additional sum of fifteen (15) cents per reel per day, and that in the event of any change in the rate of footage tax on film this amount shall be increased or decreased accordingly. In the event of a tax being imposed

on the amount of film rental payable hereunder, the exhibitor agrees to pay such tax to the distributor upon demand.

Select Pictures Corporation,
By A. S. Kane, General Manager.
Recommended: Dated —— 191—.
Frank Rogers.
By T. O. Tuttle.

Empire Theater Co.,
H. C. Farley, Mgr.
Exhibitor's Copy.

Walton H. Hill and Ball & Beckwith, all of Montgomery, for appellants.

The Select Pictures Corporation was an indispensable party, but is without the jurisdiction of the law court. Section 3054, Code 1907; 83 Ala. 498, 3 South. 449, 3 Am. St. Rep. 758; 122 Ala. 318, 25 South. 242; 180 Ala. 296, 60 South. 858. Injunction will not issue to prevent the breach of contract for sale and delivery of chattels ordinarily. 5 Pomeroy, § 264; Joyce on Injunction, § 7. In order to enjoin breach of contract, the contract must be certain and definite, and the breach must be in anticipation, not already done. 22 Cyc. 855; 14 R. C. L. 355; 86 Ala. 458, 5 South. 791, 3 L. R. A. 861; 86 Ala. 587, 6 South. 78, 4 L. R. A. 572, 11 Am. St. Rep. 72; 96 Ala. 272, 11 South. 483. Injunction will not issue to restrain one from breaching a contract when he would thereby be compelled to breach his contract with an innocent third party to his injury. 200 Ala. 208, 75 South. 966; 22 Cyc. 854; 5 Pomeroy, §§ 291, 794. Specific performance of a lease of personal property will not be decreed. 141 Ala. 580, 39 South. 243, 6 L. R. A. (N. S.) 585; 143 Ala. 351, 42 South. 102, 5 Ann. Cas. 265.

Rushton & Crenshaw, of Montgomery, for appellee.

Where several instruments constitute parts of one transaction, they will be read and construed together, 13 Corpus Juris, 528. Contracts on printed forms furnished by one of two parties are strictly construed against the party furnishing. 58 Ala. 486, 29 Am. Rep. 770; 175 Ala. 357, 57 South. 852, 13 Corpus Juris, 545. The practical construction put by parties on an agreement is controlling, when there is any sort of doubt. 159 Ala. 367, 49 South. 97; 206 U. S. 206, 27 Sup. Ct. 622, 51 L. Ed. 1026. Trade custom known to the parties is by implication incorporated into a contract between them respecting the subject-matter of such custom. 95 Ala. 469, 11 South. 117, 16 L. R. A. 291; 17 Corpus Juris, 492. The contract in this case conferred the exclusive first run privilege on the complainant, 225 N. Y. 104, 121 N. E. 756; 149 Ga. 200, 99 S. E. 615. Its breach will be enjoined. 4 Pomeroy, §§ 17, 18; 157 Mich. 488, 122 N. W. 111; 200 Ala. 208, 75 South. 966; 53 Atl. 1043; 66 N. J. Eq. 252, 57 Atl. 1025; (Ky.) 97 S. W. 761;

30 App. Div. 564, 52 N. Y. Supp. 433. The weight of modern authority is to the effect that interference with any contract amounts to a tort. 248 U. S. 215, 39 Sup. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293; 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; Page on Contracts, § 2426. The damages are speculative, and not recoverable at law, and the statutory action for recovery in specie is not an adequate remedy here. 121 N. E. 750; 149 Ga. 200, 99 S. E. 615; 180 App. Div. 475, 167 N. Y. Supp. 1027. Specific performance will be decreed of a contract to furnish personal property of a unique or special value, and also where there is a practical monopoly in the locality of articles necessary for plaintiff's business. 36 Cyc. 557, 559; Pomeroy's Equity, §§ 2170, 2171. Where the object of suit concerns an interest in personal property within the state, or where the act on which the suit is founded was to have been performed in this state, chancery will take cognizance against nonresidents. Section 3054, Code 1907; 83 Ala. 498, 3 South. 449, 3 Am. St. Rep. 758. The tort-feasors may be proceeded against individually as well as jointly. 203 Ala. 52, 82 South. 13; (C. C.) 123 Fed. 197.

THOMAS, J. The suit was for injunction. The Select Pictures Corporation never appeared nor was brought into court as a party defendant. The appeal is from a decree overruling defendant's motion to dissolve a temporary injunction against Montgomery Enterprises exhibiting the photoplay in question, and for overruling demurrers to the bill; one of the grounds thereof being that Select Pictures Corporation was a necessary party defendant.

[1] The two instruments evidencing the contract are averred to have been upon printed forms furnished by Select Pictures Corporation. It is a rule of construction of printed blank contracts—as insurance policies—that they be construed with care and caution in the enforcement of forfeiture clauses contained in such printed form. Courts are, however, not at liberty to make new contracts for parties where the language is unambiguous and they are susceptible of one reasonable construction. Cont. Cas. Co. v. Ogburn, 175 Ala. 357, 57 South. 852, Ann. Cas. 1914D, 377.

[2] The two instruments in question evidencing the contract of date September 7, 1918, are to be construed as one transaction with reference to each other. Mobile County v. Linch, 198 Ala. 57, 73 South. 423, 425; Dadeville Oil Mill v. Hicks, 184 Ala. 367, 371, 63 South. 970; Satterfield v. Fidelity Mutual Life Ins. Co., 171 Ala. 429, 434, 55 South. 200; Sewall v. Henry, 9 Ala. 24, 30; Whitehurst v. Boyd, 8 Ala. 375, 381; Holman v. Crane, 16 Ala. 570, 578; Prater v. Darby, 24 Ala.

496; Pierce v. Tidwell, 81 Ala. 299, 304, 2 South. 15.

[3] Whether time is of the essence of the contract is determined from the two instruments when so considered, having in view the circumstances of the parties and the object each had in view and the subject dealt with therein. Elliott v. Howison, 146 Ala. 568, 40 South. 1018; Dowling-Martin Co. v. Lysle Milling Co., 203 Ala. 491, 83 South. 486; Home Guano Co. v. International Agri. Corp., ante, p. 274, 85 South. 713; McFadden v. Henderson, 128 Ala. 221, 29 South. 640.

[4, 5] If a contract is of doubtful import as to any of its provisions, the practical construction put by the parties on such engagement therein is controlling of its meaning and must "often prevail over its literal meaning" (Birmingham Waterworks Co. v. Windham, 190 Ala. 634, 640, 67 South. 424; Crass v. Scruggs, 115 Ala. 258, 268, 22 South. 81; Robinson v. Bullock, 58 Ala. 618, 622; Lowrey v. Hawaii, 206 U. S. 219, 27 Sup. Ct. 622, 51 L. Ed. 1026; Chicago v. Sheldon, 9 Wall. 50, 19 L. Ed. 594); and the whole contract will be construed so as to make it legal rather than illegal (McIntyre Lbr. Co. v. Jackson Lbr. Co., 165 Ala. 268, 274, 51 South. 767, 138 Am. St. Rep. 66; Ashley v. Cathcart, 159 Ala. 474, 480, 49 South. 75). In Comer v. Bankhead, 70 Ala. 136, 141, Mr. Justice Stone states Parsons' simple rules for the construction of contracts:

"It is a rule that the whole contract should be considered in determining the meaning of any or all its parts." 2 Parsons on Contr. 13.

"The contract should be supported, rather than defeated." Page 15.

"All the parts of the contract will be construed in such a way as to give force and validity to all of them, and to all of the language used, where that is possible." Page 16.

"All instruments should be construed contra proferentem; that is, against him who gives, or undertakes, or enters into an obligation." Page 19.

[6] A trade custom, as to the subject and objects of the contract, known to the parties as prevailing in the community where the contract is executed and where to be performed, is by implication incorporated therein between the parties as respecting the subject-matter of such custom. Crandall-Pettee Co. v. Jebeles & Colias Co., 195 Ala. 152, 157, 69 South. 964; Georgia Cot. Co. v. Lee, 196 Ala. 599, 72 South. 158, 160; German-Am. Ins. Co. v. Com'l Fire Ins. Co., 95 Ala. 469, 475, 11 South. 117, 16 L. R. A. 291; Walls v. Bailey, 49 N. Y. 464, 10 Am. Rep. 407.

[7] When the two instruments are considered under surrounding circumstances of the parties and objects in view at the time of the execution of the contract, we are of opinion, if time was of its essence, that the construction of the parties was that the same was for one year, expiring in November, 1919. On October 3, 1918, the Select Pictures Corporation, through its branch manager at Atlanta, Ga., wrote complainant that—

"Our impression is that your contract with us is to become effective on or about November 1st. If correct in this surmise, we will appreciate your giving us definite exhibition dates at the earliest possible moment, in order that we may give you absolute protection on the new releases,"

—and on December 12, 1918, again wrote:

"Dame Rumor * * * informs me that a report is being circulated to the effect that a local film distributing organization alleges that they have secured the services of Norma Talmadge. I desire to state most emphatically, and I base this statement on authentic advice from an authoritative source, that Select Pictures Corporation contract for Norma Talmadge pictures runs until November, 1919, and that no other distributing organization will distribute or release (new) Norma Talmadge pictures during that period. What may happen after that cannot affect Norma Talmadge production for practically one year. In view of the fact that Miss Talmadge has released but one of the eight contracted second star series pictures and that the contract held by Select Pictures Corporation is binding in its terms for the faithful performance of all the conditions of contract, it is slightly illogical that any other company could have secured the services of Miss Talmadge until the eight pictures above mentioned shall have been delivered; therefore we repeat most emphatically that no changes will be, nor can be, made prior to the completion of her contract with Select Pictures Corporation. All contracts written or to be written by Select Pictures Corporation for Norma Talmadge second star series of eight pictures will remain in force as written and the full contracted quota of pictures will be delivered by Select Pictures Corporation regardless of any rumors or allegations to the contrary."

[8] The affidavit of Mr. Morris, general manager of the Select Pictures Corporation, showed that the negative of the picture in question, "The Isle of Conquest," was received by Select Pictures Corporation on or about September 20, 1919, and that picture was released on or about October 20, 1919; that its receipt was (in the opinion of the affiant) "nearly a month after the expiration of the period fixed by the contract as determining what pictures were covered by it and also after the cancellation of the contract." However, the date of expiration of the contract and of effective cancellation thereof are questions of law for the determination of the court. Of the time of performance it is pertinent to note that paragraph 3 of the one instrument is:

"The exhibitor agrees to play, in the order of delivery for exhibition, at least two of said photoplays during each and every period of one month commencing with the 1st day of November, 1918, and to play all of said photoplays on or before the expiration of one year from

the date of exhibition of the first of said photoplays."

In the other:

"The distributor agrees that he will, during the year commencing on or about the 1st day of September, 1918, release eight photoplays, in which the above-named star (Norma Talmadge) shall enact the leading role; and it hereby grants to the exhibitor the license to exhibit one copy of each of said photoplays, at the above-named theater only, for two successive days. * * *"

In view of this apparent conflict of date of beginning of contract, the construction placed thereon by the parties will largely control in the matter.

[9] The picture in question came to defendant, Select Pictures Corporation, and was subject to release before the expiration of complainant's contract in November, 1919, unless the contract was canceled by defendant's letter of September 16, 1919. When the averments of the bill and answers and the several affidavits are duly considered, we are not impressed that there was cancellation of the contract for reasons provided in the contract. It is recited in the contract that, "inasmuch as the distributor is dependent for its ability to perform this contract upon the production of the photoplays, * * * which may be prevented by the illness, injury, incapacity, death, or default of the artists, directors, and other persons or corporations engaged in producing the same," or prevented or delayed for various reasons beyond its control, as the conditions on which cancellation may be had on notice. None of these conditions of illness, injury, incapacity, death, or default of the artist Norma Talmadge or of her directors or other persons or corporations engaged in producing her plays, or the play in question, is shown to have intervened to prevent its receipt and release before the time of the expiration of the contract, in November, 1919. On the other hand, the contrary is averred and shown by the affidavits on which submission was had.

[10] Under the contract between the parties the Select Pictures Corporation agreed to furnish complainant with certain photographic films portraying the artist in question, for exclusive first runs at its place of business in the city of Montgomery. The defendant Montgomery Enterprises and its manager, Wilby, are charged with a knowledge of such facts as to inform them or put them on inquiry concerning complainant's contractual rights in the premises; that they knew of complainant's having long exhibited first run pictures by Norma Talmadge; and a trade publication issued November 8, 1919, contained a criticism of the play in question. If such inquiry had been prosecuted to a reasonable extent in Montgomery, it would have led to a full knowledge of the facts. The

equity of such bills, so far as pertains to an injunction against a defaulting party to a contract, has been sustained in Edmundson Drug Co. v. Partin Mfg. Co., 200 Ala. 208, 75 South. 966; Gilligham v. Ray, 157 Mich. 488, 491, 122 N. W. 111; Fleckenstein Bros. v. Fleckenstein (N. J. Ch.) 53 Atl. 1043.

In Friedberg v. McClary, 173 Ky. 579, 191 S. W. 300, L. R. A. 1917C, 777, 781, an action to restrain an insolvent from selling a large quantity of tobacco contracted to be sold to plaintiff, and to restrain designated third persons with knowledge of plaintiff's rights from purchasing was sustained by the Kentucky court. The justice said:

"We are aware that in Chambers v. Baldwin, 91 Ky. 121, 11 L. R. A. 545, 34 Am. St. Rep. 165, 15 S. W. 57, and other cases cited on the brief of defendants' counsel, it was held that one party to a contract cannot maintain an action against a third person' who even maliciously advised and procured the other party to the contract to violate it, unless such person, by coercion or deception, caused the violation of the contract by the other contracting party against his will or contrary to his purpose. But in that case the action was brought, not, as here, to prevent the violation of the contract induced by a third party, but to recover of the latter damages for his malicious interference with the contract. In the instant case no damages are sought against Buckner or Gaston, Williams, and Wigmore; it is merely sought to enjoin them from interfering with the contract between plaintiff and the defendant McClary, upon the ground that such interference was malicious, or at least in bad faith, done with full knowledge of the plaintiff's rights under the contract; and that damages that might be recovered by the latter of McClary in an action at law because of his insolvency would not afford an adequate remedy. In such state of case relief by injunction has been allowed in other jurisdictions. Beekman v. Marsters, 195 Mass. 205, 11 L. R. A. (N. S.) 201, 122 Am. St. Rep. 232, 80 N. E. 817, 11 Ann. Cas. 332; American Law Book Co. v. Edward Thompson Co., 41 Misc. 396, 84 N. Y. Supp. 225; Flaccus v. Smith, 199 Pa. 133, 54 L. R. A. 640, 85 Am. St. Rep. 779, 48 Atl. 894; Newport v. Newport Light Co., 84 Ky. 166; Wilkins v. Somerville, 80 Vt. 48, 11 L. R. A. (N. S.) 1183, 130 Am. St. Rep. 906, 66 Atl. 893; New England Phonograph Co. v. Edison (C. C.) 110 Fed. 26. The doctrine was also recognized in this jurisdiction in Turner v. Hampton, supra, wherein it was held that not only was injunction the proper remedy to prevent the violation by the trustees of a school district of a contract whereby they had employed the plaintiff to teach the school therein, but also to restrain another from teaching it under a later contract with the trustees."

In Int. News Service v. Associated Press, 248 U. S. 215, 239, 240, 39 Sup. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293, the parties litigant were competitors in the distribution of news and its publication for a profit, and the bill sought to restrain the International News

Service from using news from bulletins and excerpts from early editions, selling the same to defendant's customers. The insistence by the defendant was that, the bulletin boards and early editions having given the matter as news, the same became the common possession of all to whom it became accessible, and that the defendant had the right to convey such news to its customers and charge for same. In answering this contention Mr. Justice Pitney said:

"The fault in the reasoning lies in applying as a test the right of the complainant as against the public, instead of considering the rights of complainant and defendant, competitors in business, as between themselves. The right of a purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant—which is what defendant has done and seeks to justify—is a very different matter. In doing this defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an *unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not* [italics supplied], with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business. The underlying principle is much the same as that which lies at the base of the equitable theory of consideration in the law of trusts—that he who has fairly paid the price should have the beneficial use of the property. Pom. Eq. Jur. § 981."

The rule is stated in Citizens', etc., Co. v. Montgomery L. & W. P. Co. (C. C.) 171 Fed. 553, where injunction was maintained against the indemnifying by a certain business of a rival's customers against a recovery of damages growing out of their breach of contract where the purpose was to induce a breach of contract. The court said:

"While the law allows a trader, by mere solicitation, to persuade customers to change their business relations, without actionable liability therefor, though a broken contract is the result, it does not permit such a solicitor, even in the interests of competition, to go further, intervening actively between the contracting parties, as a dominant agency in producing a breach, by promise of indemnity to one of them to induce the breach. When the solicitor knowingly and intentionally *goes beyond mere solicitation, to induce another man's customer to do business with him, and promises to hold that other man's customer harmless for the breach of a contract with him, he transcends the rights of the law of competition, has no 'sufficient justification,'* and thereby becomes liable to him whose customer is taken over. Such conduct is an unlawful interference with another man's rights, for which he may maintain an action and recover nominal damages, although the contract be not actually breached in consequence of the solicitation." (Italics supplied.)

[11] Complainant's right in the picture "The Isle of Conquest," Norma Talmadge starring, was exclusive as to its first exhibition at Montgomery, Ala. Its receipt and date of its release by Select Pictures Corporation were admitted by its manager to have been on or about October 20, 1919. Its first run privilege was of great value in the business of the kind in which instant parties are and were engaged. Wells v. First Nat. Exhibitors' Circuit, 149 Ga. 200, 99 S. E. 615, 618. Select Pictures Corporation having granted to complainant the exclusive privilege of showing said picture at its theater in Montgomery, Ala., before its exhibition at other theaters in said city was a valuable right secured by the latter under the contract, and other theaters in Montgomery could not legally exhibit the same in disregard of complainant's contract rights of first run, after notice or knowledge of complainant's said rights. This was beyond the rights of the law of competition. The averments of the bill are sufficient to charge notice or knowledge to the resident defendants of complainant's contractual right to first run exhibitions of Norma Talmadge pictures within the city of Montgomery, where complainant and defendant were prosecuting rival businesses and had done so for a long period antedating defendant's purchase of the picture in question. The omission on the part of defendant to seek information of complainant, who it knew was or had recently been in the possession of the exclusive right of exhibiting the first run of pictures by said artist, and knew of the custom throughout the country and in this city governing same, was a failure to prosecute an inquiry with due diligence. 2 Pom. Eq. Jur. (3d Ed.) § 607, p. 962; Ivy v. Hood, 202 Ala. 121, 79 South. 587.

[12] There is no adequate remedy at law for the protection of complainant's rights. A statutory action of detinue for the recovery of the property in specie will not provide an adequate remedy at law for a breach of the contract to furnish moving picture films. Raftery v. World Film Corp., 180 App. Div. 475, 167 N. Y. Supp. 1027, 1032; 36 Cyc. 557. If detinue had been resorted to by complainant to secure possession of the film, defendant having the statutory period of five days in which to give bond and retain possession of

the chattel (Code, §§ 3778, 3780; Nixon v. Smith, 193 Ala. 443, 69 South. 117), and was exhibiting the same at the time the temporary injunction was issued, before the time fixed by the statute for delivery of the property, etc. (Code, § 3778), the film would have lost its value to complainant as a first run picture by defendant's continued exhibition thereof. The rule of the inadequacy of remedies at law in such cases is well stated.in 36 Cyc. 557, thus:

"If the specific thing contracted for is desired by plaintiff, if it cannot be duplicated, and if his reason for desiring it or the other circumstances of the case are such that money damages would not be an adequate compensation to him for its loss, equity will decree its delivery to him. The jurisdiction for this purpose is an outgrowth of, and closely connected with, the remedy for the delivery up of chattels of this special nature tortiously withheld from their owners. In such cases the legal remedies of replevin and detinue are subject to defects of procedure which prevent the successful plaintiff from invariably recovering possession of the chattel."

We now come to the question: Had the lower court jurisdiction to enjoin the exhibition of the picture by defendant Montgomery Enterprises Corporation? Of jurisdiction, pertinent provisions of our statute are:

"Courts of chancery must take cognizance of cases in equity. * * * Against nonresidents, when the object of the suit concerns an estate of, lien, or charge upon, lands, or the disposition thereof, or any interest in, title to, or incumbrance on personal property within this state, or where the cause of action arose, or the act on which the suit is founded, was to have been performed, in this state." Code, § 3054; Moore v. Alton, 192 Ala. 261, 264, 68 South. 326; Treadaway v. Stansell, 203 Ala. 52, 82 South. 12.

In Iron Age Pub. Co. v. W. U. Tel. Co., 83 Ala. 498, 505, 3 South. 449, 3 Am. St. Rep. 758, it is said of the statute (Code 1886, § 3414) that it confers jurisdiction on courts of chancery against nonresidents in four particular classes of cases: First, when the object of the suit concerns an estate of or lien or charge upon lands within this state, or the disposition thereof; or, second, any interest in, title to, or incumbrance on personal property within this state; or, third, when the cause of action arose in this state; or, fourth, when the act on which the suit is founded was to have been performed in this state. We quote from the opinion:

"The jurisdiction, as thus conferred, is plainly statutory and limited; and the general rule being that a foreign corporation cannot be sued unless it voluntarily appears to defend, it being impossible for the court to extend the arm of its process into.a foreign state or territory for the purpose of reaching it, it follows that the bill cannot be retained, unless the case made by it falls within the statute, or else it is made to appear that this objection has been obviated by an actual appearance of the defendant, so as to confer jurisdiction of its person. Sayre v. Elyton Land Co., 73 Ala. 85; Galpin v. Page, 18 Wall. 350; Field on Corporations (Wood's Ed.) § 329, note 3; Camden, etc., Co. v. Swede Iron Co., 32 N. J. L. 15; Freeman on Judg. (3d Ed.) §§ 567, 568. The present case concerns neither land nor personal property, but a contract for personal services. As we have above said, the bill fails to aver with sufficient certainty that the contract arose in this' state, or was to be performed within its jurisdiction."

The subject of that controversy was news dispatches to be delivered from time to time by the Associated Press, in the future, to the Western Union Telegraph Company at a point. without the state and by it delivered to resident publishing companies. The purpose of that bill was not to enjoin the publication of press dispatches then in the possession of the publishing companies within the jurisdiction of the Alabama courts. In discussing the sufficiency of averments of the bill in the Iron Age Case, Mr. Justice Somerville points to indefiniteness with respect to when the contract was made, or where it was entered into, or where to be performed, whether in or out of the state, and says that the bill does not with sufficient particularity aver that the telegraph dispatches were, under the contract, to be delivered to the complainant by the New York Associated Press at Birmingham through the agency of the telegraph company, or only to the latter company in New York, to be transmitted to complainant's agent without further liability on the part of the Associated Press. It was upon such vague and indefinite allegations as to the place of execution of the contract by the Associated Press that the court held that such defendant was not brought "within the class specified by the statute, and therefore shows no jurisdiction in chancery." That this is the crux of that decision is shown by the further statement of facts reciting that the bill prayed an injunction "to enjoin and restrain said Western Associated Press and New York Associated Press from selling, transmitting, or furnishing and said Western Union Telegraph Company from delivering the 'Associated Press dispatches' to said News Publishing Company, said Herald Publishing Company, or to any one for them." From such averments it was not shown that an interest in, title to, or incumbrance on personal property within the state and its use or the act on which the suit was founded was performed within the state of Alabama, as required by statute. Thus is the decision of Iron Age Pub. Co. v. W. U. Tel. Co., supra, distinguished from the averred facts in instant case showing jurisdiction within the purview of the statute. In instant case the photoplay film in question had been furnished by Select Pictures Corporation to the defendant Montgomery Enterprises, in disregard of its contract with complainant, and the aver-

ments of the pleading were that said personal property (the photoplay film in question) was within the state at the time the bill was filed, in the city where complainant and the defendant competitor both conducted moving picture businesses, and was being exhibited by one of respondents. The object of the present suit concerns an interest in or title to the specific personal property within the state and its exhibition by the Montgomery Enterprises within the state and county where the bill was filed, in disregard of complainant's superior contract rights and to its irreparable injury. Woodstock Opr. Corp. v. Quinn, 201 Ala. 681, 79 South. 253.

[13, 14] Here the resident defendants are proceeded against as tort-feasors, against whom relief can be had in the absence of service on the nonresident joint tort-feasor, sending the photoplay (the personal property, the object or subject of the contract) into the state to violate its contract with complainant by its exhibition by a business rival. Jurisdiction is acquired from the fact that the personal property of Select Pictures Corporation in question was in possession of the resident defendant, Montgomery Enterprises, which was exhibiting it at the time the bill was filed, and which exhibition by it was within the city of Montgomery, in known disregard of complainant's superior rights acquired by contract with such nonresident defendant with respect to such personal property and its exhibition at the time and place in question. In N. Y. Phono. Co. v. Jones (C. C.) 123 Fed. 197, an exclusive license for the sale of patented articles within certain territory was permitted to bring suit in equity for an injunction against a third party, who with knowledge of the license conspired with licensor to violate complainant's contract rights by selling the patented articles within the territory. In such suit, based on the tortious acts of the defendant, and not upon any contract relation, it was held that neither the licensor nor any coconspirator was a necessary party. The knowledge of the contractual relations of the parties charged to the resident defendant was the essence of the charge. Under such circumstances a person receiving injury from the tortious acts of others has a remedy against one or all of the wrongdoers and may enforce his remedy in equity against the wrongdoing of one or all at his election. Edmundson-Randle Drug Co. v. Partin Mfg. Co., 200 Ala. 208, 75 South. 966; Alcazar Am. Co. v. Mudd & Colley Am. Co., ante, p. 509, 86 South. 209.

The cases by our court relied on by appellant are not to a contrary effect. In Rucker v. Morgan, 122 Ala. 308, 318, 25 South. 242, the bill sought to have a trust agreement declared fraudulent and void, and the certificates of stock placed in the hands of the designated trustee delivered up for cancellation, and other certificates issued, and in aid of this injunctions were prayed. The bill aver-

red that the respondent corporation issuing the stock, the designated trustee who had the certificates of stock in possession, and Miller, in whose name as agent the stock stood on the books of the corporation, were all nonresidents of the state of Alabama, residing in, and being residents of, the state of Illinois. The court held that the decree sought was to operate in personam, and the court must acquire jurisdiction of the person in order to compel compliance by personal service of process, or by the voluntary appearance of the defendants in court, that the foregoing statute was not so comprehensive as to confer upon the chancery court jurisdiction to proceed to final decree to the end prayed, and further said:

"Service of its process is limited and confined to the territorial boundary of the state, and in the absence of a voluntary appearance and submission to its jurisdiction by a nonresident defendant, it can acquire no jurisdiction as to such a person, except in cases provided for in the above statute, and then not of the nonresident personally, but in the language of the statute, 'against nonresidents,' and to the extent and purpose of dealing with his interest in the subject-matter of the suit, and over which the court has rightfully acquired jurisdiction. The cases mentioned in the statute are stated with sufficient clearness not to admit of a misunderstanding. The jurisdiction of the chancery court as to nonresidents being, therefore, purely statutory, must, as to such jurisdiction, be held strictly within the provisions of the statute."

The statute was also considered in Tigrett v. Taylor, 180 Ala. 296, 303, 60 South. 858, where the bill was to enforce a trust, to compel an accounting where the incidental relief was the foreclosure of mortgages on lands in the state, which mortgages were part of the securities to be accounted for, the facts being such that complainant's right to foreclose (it was said) could not be determined until after an accounting. A pronouncement of the court was:

"Whether there can or should be any proceeding as against the land in Alabama, taking the averments of the bill as true, is contingent upon and merely incidental to the accounting and settlement of the trust. As there can be no discovery, accounting, or settlement of the trust, it cannot be known that complainant has any estate in, lien or charge upon, the lands in Alabama. The only interest Tigrett is shown to have in the lands is that of mortgagee; if the mortgagor should pay off the mortgage debt or redeem, then neither Tigrett nor complainant would have any possible interest therein. So the interest in the lands is wholly contingent upon the main equities of the bill, and is merely incidental to the relief sought."

Adverting to the Iron Age Case, where, speaking of the statute (Code, § 3054), the important distinction is made as to the jurisdiction of a court of equity under the statute, it is said:

"The present case concerns neither land nor personal property, but a contract for personal services."

The instant case is not a contract for personal services, but for the delivery of specific personal property of unique and artistic value, controlled exclusively by Select Pictures Corporation, and which personal property was at the time of filing the bill within the jurisdiction of the court, and was then being used by complainant's competitor in business in disregard of its contract rights with respect to such personal property. The right of injunction has been decreed and enforced as to contracts for such personal property. In Sou. Iron & Equip. Co. v. Vaughan, 201 Ala. 356, 357, 78 South. 212, 213; L. R. A. 1918E, 594, it was stated that,

"The general rules obtaining for specific performance are that: 'Equity will not, in general, decree the specific performance of contracts concerning chattels, because their money value recovered as damages will enable the party to purchase others in the market of like kind and quality. Where, however, particular chattels have some special value to the owner, over and above any pecuniary estimate—pretium affectionis—and where they are unique, rare, and incapable of being reproduced by money damages, equity will decree a specific delivery of them to their owner, and the specific performance of contracts concerning them.'"

See 11 Michie's Dig. p. 983, 984, §§ 47, 48; 5 Pom. Eq. Rem. (2d Ed.) 2170, 2171; 36 Cyc. 557, 559, and notes.

The fact that Select Pictures Corporation was not a party by appearance or service of process is important only as affecting the scope of the decree entered on February 2, 1920, which is as follows:

"* * * The said Montgomery Enterprises, a corporation, Select Pictures Corporation, and R. B. Wilby are hereby enjoined from exhibiting or otherwise displaying the moving picture known as 'The Isle of Conquest,' in which Norma Talmadge performed as a star, at the Strand Theater or any other theater in the city of Montgomery, Ala., until the Empire Theater Company shall have had the first run" of said motion picture at said Empire Theater.

The time and place of complainant's exclusive right to exhibit the personal property being acquired and fixed, and the contract being interpreted by the parties of its ambiguous provision as to when the year of its operation began, the use by another person with knowledge or notice of said personal property contrary to contract, within the jurisdiction of the court, may be enjoined in cases provided by the statute. Code, § 3054. This extraordinary relief may be granted in a proper case, as provided by statute, where the personal property, the object of the contract and its use, is within the jurisdiction of the court, though specific performance may not be enforced against its nonresident owner and offending party to the contract who has not been subjected to or submitted to the jurisdiction of the state court.

[15] It is only by injunction that the instant contract rights of the parties may be safeguarded against the exhibition of the photoplay film by a business rival. If publication against Select Pictures Corporation as a nonresident be first required before issue of the temporary writ preventing the illegal use of the photoplay film in the exhibition of the picture, which was being exhibited within the jurisdiction of the court when the bill was filed, its subsequent prohibition by the final decree would have been nugatory, since the "first run" exhibition would have been completed by respondent, and complainant would have sustained its irreparable injury sought to be prevented by the injunction. The temporary injunction against Select Pictures Corporation as to its use of said personal property will not be made permanent without compliance with our statutes providing due notice by publication to such nonresident owner whose personal property was the subject of the suit and the object of the contract. Windsor v. McVeigh, 93 U. S. 274, 277, 278, 23 L. Ed. 914; Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565; Grannis v. Ordean, 234 U. S. 385, 34 Sup. Ct. 779, 58 L. Ed. 1363; Amer. L. Co. v. Zeiss, 219 U. S. 47, 31 Sup. Ct. 200, 55 L. Ed. 82; Gill v. More, 200 Ala. 511, 76 South. 453; Exchange Nat. Bank v. Clement, 109 Ala. 270, 19 South. 814.

The decree for temporary injunction was sufficient to prevent Montgomery Enterprises and its agent, Wilby, from exhibiting at Montgomery at the time indicated the personal property in question of Select Pictures Corporation contrary to complainant's contract rights with the latter corporation and to its irreparable injury. The demurrer to the bill was properly overruled.

The decree of the circuit court, in equity, is affirmed.

ANDERSON, C. J., and McCLELLAN and SOMERVILLE, JJ., concur.

---

&⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes