GREAT LAKES & ST. LAWRENCE TRANSP. CO. et al. v. SCRANTON COAL CO.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1917.)

No. 2434.

1. COURTS ⬤⇒276—FEDERAL COURTS—DISTRICT OF SUIT—WAIVER OF OBJECTION.

Where a bill contains allegations of diversity of citizenship, which give a federal court jurisdiction, but do not entitle complainant to maintain the suit in that district the right to make objection on that ground is a privilege which may be waived, and which is waived by a general appearance, either to plead to the merits or to contest on the merits a preliminary matter, as an application for a preliminary injunction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 815.]

2. CARRIERS ⬤⇒78—CONSTRUCTION—IMPLIED OBLIGATIONS.

Complainant, a large shipper of coal on the Great Lakes, entered into a contract with defendant, a shipowner, which provided in substance that during three seasons complainant would employ certain of defendant's steamers to transport its coal westward from Oswego at stated rates of freight. It agreed to load all of such vessels on their west-bound trips, subject to exception in case of strikes, etc., while defendant agreed to carry the said coal on all west-bound trips of the steamers, subject to like exceptions, or in case of loss of a vessel. The parties had conducted business under similar informal contracts for a number of years. Held that, in view of the circumstances and relation of the parties, the contract carried with it an implied obligation of defendant to continue its business during the term and to run its boats in a reasonable manner continuously from Oswego westward.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 272–395.]

3. INJUNCTION ⬤⇒59(1)—SPECIFIC PERFORMANCE ⬤⇒5, 68—CONTRACTS ENFORCEABLE—CONTRACTS FOR CONTINUOUS ACTS—REMEDY AT LAW.

On proof by complainant that it could not obtain other vessels of suitable size to carry its coal and deliver the same at its established terminals, and that its business had been so built up that it could be profitably conducted only by water transportation, complainant was entitled to an injunction to restrain defendant from selling the vessels for foreign service, and a specific enforcement of the contract, especially if it was further shown that the sale of the vessels would leave defendant insolvent and unable to respond in damages.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 114, 116; Specific Performance, Cent. Dig. §§ 5–8, 199.]

4. SPECIFIC PERFORMANCE ⬤⇒23—PERSONS AGAINST WHOM PERFORMANCE MAY BE ENFORCED—PURCHASERS.

Complainant was not barred from such relief by the fact that defendant had already sold its vessels to its principal stockholder, who was its vice president and a director, and who had full knowledge of the contract.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 52.]

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. SPECIFIC PERFORMANCE ☜16—DEFENSES—HARDSHIP OF ENFORCEMENT.

The contract having been deliberately made in view of the war conditions then prevailing in Europe, was not improvident, and a court of equity will not refuse to enforce it because its enforcement would deprive defendant of large prospective profits from the sale of its vessels.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 29, 35, 36.]

6. SPECIFIC PERFORMANCE ☜6—RIGHT TO RELIEF—MUTUALITY OF REMEDY.

If specific performance be otherwise proper, equity is not deterred from granting its aid because of a so-called lack of mutuality in the remedy; but it suffices that defendant's compulsory performance is conditioned upon complainant's continued readiness to carry out his obligations.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 9–11.]

7. SPECIFIC PERFORMANCE ☜75 — CONTRACTS ENFORCEABLE — CONTINUING CONTRACTS.

The need of continuous supervision does not bar, however much it may deter, a court of equity from exercising its jurisdiction to enforce specific performance of a contract when the ends of justice seem to require it.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 210.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Scranton Coal Company against the Great Lakes & St. Lawrence Transportation Company, George E. M. Pratt, and others. From an order granting a preliminary injunction, defendants appeal. Affirmed.

Henry Russell Platt and Charles E. Kremer, both of Chicago, Ill., for appellants.

John B. Richards, of Buffalo, N. Y., for appellee.

Before KOHLSAAT, MACK, and EVANS, Circuit Judges.

MACK, Circuit Judge. This is an appeal from an order granting a temporary injunction restraining the sale of nine certain boats or the sending of them from the Great Lakes or the St. Lawrence river beyond Montreal. Plaintiff's rights were based upon a contract between it and the defendant Transportation Company, dated January 17, 1916, the threatened sale of the boats for use in European waters, and the resulting irreparable damage because of plaintiff's contractual obligation to ship coal and the impossibility of obtaining suitable vessels therefor. Plaintiff is alleged to be a citizen of Pennsylvania, and the defendant corporation, a citizen of Virginia; the individual defendants, its directors, citizens of Illinois.

The contract provided in substance that plaintiff employ the nine named steamers—

"for transportation of its coal from the port of Oswego, N. Y., to their full capacity on all west-bound trips, for the season of navigation on the Great Lakes of the years 1916, 1917, 1918, at the rate of freight of seventy cents (70c.) per net ton to Lake Michigan, and sixty cents per net ton to Lake Superior, free in and out, and shall load and unload their respective cargoes from time to time so as to give the said vessels reasonable and ordinary dispatch, substantially the same as heretofore, unless prevented by strikes, disasters or other matters beyond its control hereinafter more fully specified."

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

Defendant corporation agreed:

"To carry the said coal on all trips west-bound of its said steamers, or any of them, at the said rates of freight for the seasons of navigation aforesaid."

The contract further provided:

"That if at any time the operations or business of the party of the first part at the mines or on the roads by which coal is to be transported to the place of shipment aforesaid, are interrupted by floods, breaks, accidents, combinations, or by turnouts or strikes, or by casualties of any kind, the obligations of the said party of the first part to furnish cargo or cargoes under this contract for the period of such interruption may be suspended for and during the period of such interruption and interruptions from time to time, by notice in writing to the party of the second part, without liability for damages by reason of failure to furnish cargoes and make shipments during such period or periods of suspension; * * * that if at any time the operations or business of the party of the second part or any of its respective steamers, are interrupted by breaks, accidents, combinations, perils of navigation, or by turnouts, strikes, or by casualties of any kind, the obligations of the party of the second part and its respective ships to carry under this agreement shall be suspended during the period or periods of operation of such causes from time to time, by notice in writing to the party of the first part, without liability for damages by reason of failure to carry cargoes during such period or periods of suspension; * * * that in case of actual or constructive total loss of any of the vessels aforesaid, this contract shall be abated and canceled to the extent of the capacity of such vessel or vessels without liability for damages and without claim or compensation whatsoever by the party of the first part on account of the same."

[1] 1. Both the original and the amended bill allege the facts as to citizenship and residence; while the diversity of citizenship essential to federal jurisdiction existed, there was neither such residence in the Northern district of Illinois, nor allegation thereof, as, under section 51 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1101 [Comp. St. 1913, § 1033]), would have permitted the court, against defendant's objection, to exercise its jurisdiction. This right to object, however, is a privilege which defendant may waive. A general appearance is such a waiver. Eldorado Coal and Mining Co. v. Mariotti, 215 Fed. 51, 131 C. C. A. 359, and cases cited.

While it is true that the time given under the rules for pleading enables a defendant carefully to examine the bill and fully to consider whether or not he shall waive this privilege, it does not follow that he may not be called upon for a decision at some earlier period; concededly, he may voluntarily waive the time period and enter a general appearance. And if, as in the instant case, the exigencies of the proceedings require prompt action by the parties and by the court long before the day for pleading, the defendant, in our judgment, is not absolved from forthwith either asserting his personal privilege or waiving it.

Though this may at times result in the loss to a defendant of a statutory privilege, through inadvertence and without real negligence, we deem it but the logical application of the salutary principle underlying the rule requiring, as his first step in the litigation, a special appearance for this specific purpose in order to preserve the right, namely, that a party shall not attempt to win out on the merits and, if unsuccessful or subsequently unwilling to risk a decision in that court, then be able

to avert the consequences, for causes not absolutely fatal to the court's jurisdiction. And it is therefore immaterial that the objection is urged, as in this case, before the court has expressed its views, but after a full hearing on the motion for a preliminary injunction.

New equity rule 29 [198 Fed. xxvi, 115 C. C. A. xxvi] in permitting defenses in point of law arising upon the face of the bill to be made in the answer, and in providing that defenses theretofore presentable by plea in bar or abatement shall be made in the answer, does not, in our judgment, change the law in this respect. It aims at simplifying the pleadings, not at abolishing the requirement of a special appearance at the outset, if the personal privilege is intended to be asserted. It is unnecessary in this case to determine whether or not the rule has changed the former practice (Lehigh Valley Coal C. v. Yensavage, 218 Fed. 547, 134 C. C. A. 275), so as to permit the objection to the jurisdiction to be coupled with an alternative defense on the merits, if it clearly appear that the personal privilege is not thereby intended to be waived. For if this right be granted by rule 29, it was not here exercised; no attempt was made to raise the question of privilege until after the privilege itself had been waived by opposition on the merits to the granting of a temporary injunction.

That the original bill failed to allege in express terms that the amount in controversy exceeded $3,000, for which reason it was amended after the hearing, does not enlarge the defendant's rights. The amendment was purely formal; it is apparent from the other allegations of the original bill that much more than the jurisdictional amount was involved. Moreover, if the objection had been well founded, it would not have gone to the jurisdiction of the court in the true sense of the word.

Furthermore, this objection has no connection whatever with the personal privilege or the waiver thereof. While a defendant who is actually deceived by false jurisdictional or residential allegations in the bill does not lose his right or privilege to object to further proceedings when the true facts appear (Lehigh Valley Coal Co. v. Washko, 231 Fed. 42, 145 C. C. A. 230), one who is not so misled should not and does not regain a waived privilege, merely because the amendment of the bill on other points gives him the right of pleading anew to the merits of the cause.

[2] 2. We come, then, to the interpretation of the contract. There is no express provision that the steamers, or any of them, shall make any trips whatsoever, eastward or westward; there is no express provision that the trips, if and when made, shall extend as far east as Oswego. And therefore defendant contends that the obligation to carry coal westward is conditioned solely upon the Transportation Company's uncontrollable willingness to run the boats on Lake Ontario. If this be the sound construction of the agreement, the bill must be dismissed, for, under such circumstances, the court would not tie defendant's hands.

But we cannot accede to these contentions or adopt this construction. The obligation to carry defendant's coal on all west-bound trips, fairly interpreted in the light of the context and of the relations of

the parties out of which the written agreement grew, carries with it the further implied obligation to run the boats in a reasonable manner continuously during the period of navigation on the Great Lakes east-bound to or beyond Oswego and west-bound calling at this port.

Precedent can throw but little light on the sound interpretation of such contracts, especially as to implying unexpressed obligations: each has its own individuality, its own background and surrounding circumstances. Words are only symbols, and at times, even in the most formal agreement, but elliptical expressions of the mutual understanding; the underlying mutual intent, sought by both parties to be clothed in the language used, must be ascertained; text, context, and extrinsic circumstances, including prior negotiations and relations, may be considered to enable the court to view the matter from the standpoint of the parties at the time of making the contract.

Looking at the agreement in its entirety, we find the circumstances that will suspend the obligation, in whole or in part, of each party, clearly specified, such as strikes, accidents, or the loss of a vessel; it is not the obligation to continue a west-bound voyage from Oswego once begun, but the obligation to continue in the conduct of its business, that is expressly remitted or suspended; clearly this has reference to the entire future of the three-year period of the contract; it would be unnecessary to abate the obligation to carry in the event that a vessel be destroyed, if the duty to carry from Oswego were subject to the owner's arbitrary right to keep the vessel on Lake Erie. Furthermore, such a construction would place this part of the plaintiff's business completely at the mercy of the shipowner, inasmuch as plaintiff's obligation is absolute, except for the specified excuses, to give defendant its cargo on call at the port. A bilateral contract of the nature here in question will not lightly be construed, so as to give one of the parties a virtual option, instead of imposing upon each of them obligations conditioned solely as they may have expressly agreed.

In Rhodes v. Forwood, 1 A. C. 256, the case most relied upon by appellants, the House of Lords refused to imply an obligation of a mine owner to continue as such owner for seven years because he had given plaintiff an exclusive agency in the city of Liverpool for that time. But this result was reached in view of the express concession of the plaintiff that there was no obligation to sell him any coal whatsoever or to refrain from shipping the entire output elsewhere than to Liverpool. Compare, Ogdens, Ltd., v. Nelson, [1904] 2 K. B. 410, affirmed in [1905] A. C. 109. Similar agency cases are common: the mere creation of an exclusive agency in and for one locality for a definite period does not imply an obligation on the part of the principal to continue his nation-wide business for that time. Pellet v. Insurance Co., 104 Fed. 502, 43 C. C. A. 669. The relative importance of the parties' interests may justify the view that they do not intend more than that the agency should be exclusive while the business continues, but not exceeding that specified time. In the instant case, however, practically one-half of defendant's business is involved.

Moreover, the agreement expressly provides that the Coal Company is to employ the vessels and load them "substantially the same as heretofore" and that the Transportation Company is "to carry the said coal on all trips west-bound." The "said coal" refers to the coal loaded as theretofore; that is, in accordance with their former arrangements. While this was their first written agreement, they had had similar dealings under informal contracts for a number of years. The course of action during that time was substantially in accordance with plaintiff's contentions as to the interpretation of the agreement; that is, that while these steamers were tramp vessels, with no definitely fixed trips, they did in fact ply fairly regularly between Oswego and Milwaukee as well as beyond these ports.

Furthermore, the prior negotiations (U. S. v. Bethlehem Steel Co., 205 U. S. 105, 27 Sup. Ct. 450, 51 L. Ed. 731), and the direct statements of the parties, not to third persons, but to one another, make it clear that they intended by this agreement to tie up the boats in question for three successive seasons. Their very purpose was to prevent the sale; to continue the relations theretofore existing; to make them more permanent. And while, if the language of the agreement clearly fails to express such purpose, it will not be perverted, yet if it be reasonably susceptible of a construction in accordance with their mutually expressed aim, it will be so construed.

[3] 3. But it is strenuously denied that the remedy at law is adequate, or that equity in such a case will give or compel, directly or indirectly, specific performance of the contract. The question, on this appeal from a preliminary injunction, is whether there was an abuse of judicial discretion in granting it. Without detailing the conflicting affidavits, we are of the opinion that the District Court was justified therefrom in concluding that no other boats of a size small enough to pass through the Welland Canal were obtainable; that even if plaintiff could be adequately compensated for any increased freight cost in shipping by rail to Buffalo instead of to Oswego, and thence by water westward, boats of a size to dock at Chicago and Milwaukee, at places reasonably available for plaintiff's established trade, could not be secured for the three-year period; that plaintiff's business had been so built up for delivery by water that the necessity of all-rail shipment would have disrupted it, or have injured it far in excess of the increased freight rate and in a measure difficult, if not impossible, of judicial ascertainment. If on full hearing these conclusions be sustained by the evidence, plaintiff will have demonstrated the inadequacy of a remedy at law.

Moreover the court was justified on the affidavits in concluding that Pratt, the principal stockholder, had paid for the boats in the company's own stock, with but a nominal cash addition; that the transaction would leave the company insolvent, and be a fraud upon plaintiff, as its obligee and creditor; and that under these additional circumstances, the discretionary right of a court of equity to grant specific performance should be exercised, rather than that the plaintiff should be remitted to an action at law against the corporation, necessa-

rily to be followed by further proceedings against such of its stockholders as had taken its property by methods which, however valid between them and the corporation, were invalid as against its creditors.

[6] If specific performance be otherwise proper, equity is no longer deterred from granting its aid because of a so-called lack of mutuality in the remedy. It suffices that defendant's compulsory performance is conditioned upon plaintiff's continued readiness to carry out his obligation. Montgomery Traction Co. v. Montgomery Light & Water Co., 229 Fed. 672, 144 C. C. A. 82; Ames, Lectures on Legal History, p. 376. See, too, Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856.

[7] Nor does the need of continuous supervision bar, however much it may deter, the court from exercising jurisdiction when the ends of justice seem to require it. Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843; Union Pacific R. Co. v. Chicago, R. I. & P. R. Co., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265; Prospect Park & C. I. R. Co. v. C. I. & B. R. Co., 144 N. Y. 152, 39 N. E. 17, 26 L. R. A. 610; Jones v. Parker, 163 Mass. 564, 40 N. E. 1044, 47 Am. St. Rep. 485; Mayor of Wolverhampton v. Emmons, 1901, 1 K. B. 515.

[4] 4. That Pratt had purchased the boats, and contracted to resell them just before this suit was brought, will not defeat plaintiff. Pratt had been the Transportation Company's vice president and director; at the time of the alleged purchase, he was its principal stockholder; he had full knowledge of the contract, and of plaintiff's claim. He can be fully protected as against the company or any other stockholders for the money paid by him to secure the discharge of the mortgage on the boats or given to the company on account of the purchase price. His knowledge of the entire situation subordinates him as owner to plaintiff's prior equitable right to specific performance.

[5] 5. The contract in question was fairly made, in view of the war conditions then prevailing; plaintiff wanted to assure the continuance of its business in the manner in which it had theretofore been conducted; defendant's then stockholders and directors were willing to tie up their boats, practically to lease these specific and, under the then and now prevailing conditions, unique chattels for more or less certain trips and period; the progress of the war greatly enhanced the value of the boats, so that a sale thereof for use in European waters would be highly profitable to defendants. A court of equity will weigh the relative advantages and disadvantages to each of the parties that would be occasioned by its interposition; there is no absolute right to its aid; it would not enjoin the breach of the contract merely because of the existence of the obligation; it would not prevent defendant from reaping the harvest of war profits merely to maintain the inviolability of contracts; it would not compel performance of a contract improvidently made; it will so mold and condition its aid as to subserve the interests of all parties wherever possible. But a contract fairly and honestly entered into is not improvident merely

because, due to rapid changes in war times, its fulfillment involves the sacrifice of large prospective profits; and that sacrifice will be demanded, if the just rights of the other party cannot otherwise be fully and adequately maintained.

Order affirmed.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes