In re WATERSON, BERLIN & SNYDER CO.

FAIN et al. v. IRVING TRUST CO.

No. 27.

Circuit Court of Appeals, Second Circuit.

April 13, 1931.

Wise, Whitney & Parker, of New York City (John Dashiel Myers, of Philadelphia, Pa., and Frank C. Welles, of New York City, of counsel), for appellant.

Nathan Burkan, of New York City, for appellees.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The bankrupt was a music publisher. Prior to bankruptcy it had purchased from the petitioner Fain, and others, musical compositions, including words and music, under agréements all of which were identical except as to royalty rates and advance royalties. There were agreements made with twenty-two such composers.

The provisions of the royalty contracts important for consideration are illustrated by the following taken from the contract with one of the composers:

"For the Consideration of the sum of One dollar, in hand paid to Jimmie Monaco, party of the first part, by Waterson, Berlin & Snyder Co., party of the second part, the receipt whereof is hereby acknowledged, the said party of the first part does hereby sell, set over and transfer unto the said party of the second part, its successors and assigns, a certain song or musical composition, including the words and music thereof, bearing the title 'You Went Away Too Far and Stayed Away Too Long' or any other title, name or style the said party of the second part may at any time give to said composition, together with the right to take out a copyright for or upon the same, and each and every part thereof, including the words and music, to the full extent in all respects as the party of the first part could or might be able to do if these presents had not been executed.

"And The Said Party of the second part hereby covenants and agrees in the event of the publication by it of the said song or musical composition, to pay to the party of the first part 1¢ cents upon each and every ordinary printed pianoforte copy sold and paid for of the said song or musical composition hereafter sold by the party of the second part in the United States, except as hereinafter mentioned or specified, such payment

to be made only upon a full and complete compliance with all and singular the terms and conditions herein contained on the part of the party of the first part. And it is hereby expressly agreed that out of the first royalties to which the party of the first part may be entitled by or under the terms of this agreement the sum of $500.00 dollars, paid as advance Royalty, shall be deducted.
* * *

"And The Party of the first part hereby covenants and represents to Waterson, Berlin & Snyder Co., for the purpose of inducing it to accept an assignment of said song and musical composition, and to enter into and execute this agreement and make the payment above mentioned, that he has not heretofore sold, mortgaged, hypothecated, or otherwise disposed of or incumbered any right, title or interest in or to said song or musical composition or any part thereof, and has not made or entered into an agreement with any person, firm or corporation in any wise affecting the said song, words or musical composition, and that he is the author and composer and absolute owner thereof, and has the full right, power and authority to make this assignment and agreement.

"We agree to pay 33⅓% jointly of all revenue received from Mechanical reproductions less any expense incurred.

"Settlement On This Agreement shall be made semi-annually within thirty (30) days after the first days of January and July, respectively, during the whole term in existence of the copyright of said song and musical composition, according to such correct and proper statements of account as may be available on such days. Any such payment when made and accepted shall operate as a release to the said party of the second part, his successors or assigns, from any further claim or liability for any royalty up to the date thereof."

On September 20, 1929, and after the adjudication in bankruptcy which occurred late in August or early in September, 1929, the Irving Trust Company, which had been appointed receiver of Waterson, Berlin & Snyder Company, sent a circular to various persons in the music trade inviting bids before October 1, 1929, for all of the right, title, and interest of the bankrupt estate in the copyrights for the songs free from royalty claims. The circular stated that on October 1, 1929, the receiver proposed to submit the bids for individual songs, including rights to mechanical royalties, to the court for acceptance.

Thereupon Fain and the other composers filed a petition in the District Court alleging that in entering into their contracts they had relied on the reputation and organization of Waterson, Berlin & Snyder Company as leading musical publishers to popularize their publications and to increase sales of the songs, that the bankruptcy of the publishers had disabled them from further performance of the contracts to publish, and that, if the receiver was permitted to sell the compositions and copyrights free from royalty claims, purchasers would publish them without obligation to pay further royalties to the composers, who would thus be deprived of all revenue from their productions. The petitioners prayed for an order directing the receiver or trustee in bankruptcy to reassign the copyrights to them, or, in the alternative, not to sell without provision for the payment of future royalties to the composers, and for other and further relief.

The District Judge, though finding that each agreement involves "a transfer, absolute on its face, in exchange for a covenant by the publisher for the payment of certain agreed royalties," held that the "royalty contracts * * * involve such personal elements of trust and confidence that they are not assignable without the consent of the parties," and that they may "be rescinded by the composers when the publisher, as here, is unable or definitely refuses to fulfill his obligations thereunder." He therefore granted the petition and ordered that the royalty contracts be rescinded and that the trustee in bankruptcy should reassign each copyright to the composer upon the return to the bankrupt estate of any unearned advance royalties paid thereon to such composer.

The trustee has taken this appeal, which raises the questions (1) whether the trustee has a right to sell the copyrights at all; (2) whether, if he has a right to sell them at all, he may sell them free and clear of royalties.

The questions involved are interesting, and few precedents can be found in the American courts that throw direct light on the problems involved. We find difficulty in taking the view adopted by the District Judge, in spite of his interesting and informing opinion, because it disregards the unqualified grant to the publisher, and because it appears to give no weight to the labor, skill, and capital which a publisher expends in putting a song on the market. The expense of maintaining an organization, of building up a business and making it available to the composers of songs, as well as the more di-

rect cost of making plates, advertising, and distributing the songs so as to give them popularity, largely go for nought if a rescission of the contracts be ordered on the sole condition that the composers return unearned advance royalties. Such a disposition seems specially inequitable where in the case of some, if not many, of the songs there are no unearned advances whatever.

In attempting to allow the composers any relief, we are confronted by certain decisions holding that an agreement to pay royalties in exchange for a transfer of title is nothing but an executory contract to pay, enforceable only at law. Bigham, J., in Re Grant Richards, [1907] 2 Q. B. 33, held that the trustee in bankruptcy of a publisher, who had purchased the copyright of a book and agreed to pay royalties to the author upon sales, could sell the copyright and was not even liable for royalties upon sales of the publication made by him as trustee. In other words, the relation was held to be that of debtor and creditor and the author was allowed no more than the right to prove his claim against the bankrupt estate. The foregoing decision of Bigham, J., is referred to with approval by Scrutton, L. J., in the Court of Appeal in Barker v. Stickney, [1919] K. B. 121, where an author who had sold his copyright under an agreement with the purchaser to pay royalties was held to have no lien upon the copyright in the hands of a subvendee who took title with notice of the original agreement. It was said (page 132) that "a person acquiring a chose in action is not bound by mere notice of a personal covenant by his predecessor in title."

The foregoing decisions would indicate that the assignor of a copyright has only the right to recover at law for the breach of an agreement to pay royalties, and would have no control over the use of the copyright by his vendee or a subvendee. This rigorous doctrine, attributed to the English courts, is certainly far less satisfactory than that adopted by the court below, for, in case of bankruptcy or insolvency of the purchaser of the copyright, it deprives the author of any substantial remedy, though the consideration he was to receive for parting with his compositions was to depend on royalties accruing from a business during a long period of years. Under such a doctrine rescission could not be had even in the event of a complete failure to publish the songs.

But In re Grant Richards and Barker v. Stickney do not represent the sole current of English authority regarding the rights of a person in the position of the trustee in the present case.

In Werderman v. Society Generale d'Electricite, 19 Ch. D. 246, a patentee had assigned letters patent to A and B, who covenanted with him that they and their assigns would use their best endeavors to introduce the invention by granting licenses or working the patent or by selling it, and that the patentee should be entitled to 5 per cent. of all net profits received by A and B, their executors or assigns, whether arising from royalties, sales, or otherwise, and that an account of profits should be rendered yearly to the patentee and his share of the profits paid to him by A and B and their executors or assigns, with a proviso that, after a sale had been made of the patent, the interest of the patentee in the profits should cease and a final account be come to. A and B had taken the assignment with a view to forming a company to work the patent. The company was formed and the patent made over to them. The patentee sued the company for an account of profits. The company demurred on the ground that there was no privity between it and the plaintiff and that the plaintiff's right, if any, was against A and B only. The Court of Appeal held that the plaintiff could sue the company for an account of profits because the stipulations of the assignment to A and B amounted to a covenant that the owners of the patent for the time being should account for and pay to the plaintiff a share of profits unless a sale within the meaning of the deed was effected, and that no person taking the patent with notice of this contract could refuse to give effect to it. The argument was made that the plaintiff had acquired nothing but the personal obligation of A and B, but Jessel, M. R., said:

"It is a part of the bargain that the patent shall be worked in a particular way and the profits be disposed of in a particular way, and no one taking with notice of that bargain can avoid the liability."

Lindley, L. J., said that the assignment was "subject to the obligation to account to the plaintiff for his royalty." A difference between the agreement in that case and the contract in the case at bar is that royalties were here to be paid on sales of the songs at so many cents a copy, while in the English contract the royalties were to be based on 5 per cent. of the net profits. It may accordingly be argued that that decision turned on the covenant to pay a percentage of the net profits and that such a covenant gave the plaintiff an interest in the patent such as

Justice Holmes recognized in Pratt v. Tuttle, 136 Mass. 233.

But most of the decisions do not regard an agreement to pay a royalty based upon a certain percentage of the profits as creating an equitable ownership in a patent or copyright. Rude v. Westcott, 130 U. S. 152, 9 S. Ct. 463, 32 L. Ed. 888; Ehrlich v. Mills, Inc., 215 App. Div. 116, 213 N. Y. S. 395; Moore v. Coyne, 113 App. Div. 52, 98 N. Y. S. 892; Henderson v. Dougherty, 95 App. Div. 346, 88 N. Y. S. 665; Langdell Survey of Equity Jurisdiction (2d Ed.) p. 93. The gist of the decision in the Werderman Case and in the prior case of De Mattos v. Gibson, 4 De G. & J. 276, on which that decision largely rested, was that one who takes property with notice that it is to be used in a particular way receives it subject to something resembling an equitable servitude.

In the case at bar there was an agreement to pay "33⅓% * * * of all revenue received from Mechanical reproductions less any expenses incurred," as well as to pay one cent upon each copy of the songs sold. Such a provision involved an implied covenant to work the copyright so far as was reasonable under all the circumstances. Under the doctrine of the Werderman Case, any purchaser of the copyrights who took with notice of such a covenant would take them subject to it, and, we believe, also subject to payment of royalties, without which the obligation to work the copyright would be futile.

We realize that the Werderman Case has been criticised and was distinguished in Barker v. Stickney, on the supposed ground that the Werderman decision depended on an agreement which created a specific charge. Indeed, it was said by Scrutton, L. J., in Barker v. Stickney, that the Werderman decision would not be supported on the theory that mere notice of a contract relating to the use of personal property will bind a purchaser who is not a party. But in Lord Strathcona Steamship Co. v. Dominion Coal Co., [1926] A. C. 108, the purchaser of a ship who had notice of a charter party entered into for its employment was enjoined at the suit of the charterer from using the vessel in any way inconsistent with the charter party. The doctrine on which the decision largely depended was laid down by Knight Bruce, L. J., in De Mattos v. Gibson, 4 De G. & J. 276, and was relied on by Jessel, M. R., in the Werderman Case, and was expressly adhered to in the Lord Strathcona decision. Lord Shaw said at page 125 of the Lord Strathcona:

"If a man acquires from another rights in a ship which is already under charter, with notice of rights which required the ship to be used for a particular purpose, and not inconsistently with it, then he appears to be plainly in the position of a constructive trustee with obligations which a court of equity will not permit him to violate. It does not matter that this court cannot enforce specific performance. It can proceed, if there is expressed or clearly implied, a negative stipulation."

Professor Wade, in his article entitled "Restrictions on User" in The Law Quarterly Review, vol. XLIV, discussed the Lord Strathcona and other English cases, and said (at page 65) that "it should now be recognized as both good law and good sense that the claim of a covenantee under a restrictive condition as to user depends solely on the validity and priority of a charge thereby created."

See, also, opinion of Romer, L. J., in Bagot Pneumatic Tyre Co. v. Clipper Pneumatic Tyre Co., [1902] 1 Ch. at page 162; MacDonald v. Eyles, [1921] 1 Ch. 634; Falcke v. Gray, 4 Drew. 651; "Equitable Liabilities of Strangers" in Columbia Law Review, vol. XVIII, p. 291, by Harlan F. Stone; "Equitable Servitudes on Chattels" in Harvard Law Review, vol. XLI, p. 945, by Zechariah Chaffee.

The English courts have been embarrassed by the supposed analogy of restrictive covenants relating to land, which in England required the existence of a dominant and servient tenement, and by their traditional inability to enforce most affirmative covenances as well as by their rule never to rescind conveyances except for fraud. The American decisions have permitted somewhat broader relief in certain circumstances.

Courts in the United States have enforced rights resembling an equitable servitude binding on a third party who has acquired personal property from one who is under a contract to use it for a particular purpose or in a particular way. Murphy v. Christian Press Ass'n Pub. Co., 38 App. Div. 426, 56 N. Y. S. 597; New York B.-N. Co. v. Hamilton, etc., Co., 83 Hun, 593, 31 N. Y. S. 1060; Great Lakes & St. Lawrence Trans. Co. v. Scranton Coal Co. (C. C. A.) 239 F. 603; Lorillard Co. v. Weingarden (D. C.) 280 F. 238; Montgomery Enterprises v. Empire Theatre Co., 204 Ala. 566, 86 So. 880, 19 A. L. R. 987; Rider, Petitioner, 16 R. I. 271, 15 A. 72. See Lord Strathcona Steamship Co. v. Dominion Coal Co., and the Werderman Case already discussed.

In both countries, where there has been a conveyance upon an agreement to pay the grantor sums of money based upon the earnings of property transferred, the courts have implied a covenant to render the subject-matter of the contract productive—if the property was a mine, a covenant to mine, quarry, or drill; if it consisted of a patent or copyright, a covenant to work the patent or copyright. Telegraph Dispatch & Intelligence Co. v. McLean, 8 Ch. App. 658; McIntyre v. Belcher, 14 C. B. (N. S.) 655; Brewster v. Lanyon Zinc Co. (C. C. A.) 140 F. 801; Neenan v. Otis Elevator Co. (C. C. A.) 194 F. 414; Pritchard v. McLeod (C. C. A.) 205 F. 24; Oscar Barnett Foundry Co. v. Crowe (C. C. A.) 219 F. 450; Great Lakes & St. Lawrence Transp. Co. v. Scranton Coal Co. (C. C. A.) 239 F. 603; Diamond Alkali Co. v. P. C. Tomson & Co. (C. C. A.) 35 F.(2d) 117; Wood v. Lady Duff-Gordon, 222 N. Y. 88, 118 N. E. 214; Ellis v. Swan, 38 R. I. 534, 96 A. 840; Dow v. Harkin, 67 N. H. 383, 29 A. 846; Gillette v. Metzgar Register Co., 243 Mich. 48, 219 N. W. 644; Stoddard v. Illinois, etc., Co., 275 Ill. 199, 113 N. E. 913; Breckenridge Asphalt Co. v. Richardson, 147 Ky. 834, 146 S. W. 437; Conrad v. Morehead, 89 N. C. 31.

The difference between the English and American decisions lies in the fact that our courts have allowed rescission where there has been a failure on the part of the grantee or assignee to act in accordance with his obligation to render the property conveyed productive, while the English courts have refused to allow it except for fraud.

In Neenan v. Otis Elevator Co. (C. C. A.) 194 F. 414, there was an assignment to the Otis Elevator Company, "its successors and assigns," of "the entire right, title and interest" of the owner of certain patents, with an agreement that that company should "proceed with reasonable diligence to test the apparatus * * * and if such test results satisfactorily, within such further reasonable time as is convenient, to put said apparatus into practical use," and should in such event pay royalties thereon. The test proved satisfactory, but the Otis Elevator Company failed to make any practical use of the invention for five years. The trial court (180 F. 997), in spite of the absolute conveyance of the patents, held that there should be a rescission of the contract, saying as to the parties to the contract (page 417 of 194 F.):

"While they were not formally in a fiduciary relation * * * the scope of their obligation is fairly to be interpreted with an eye upon the fact that his profits would come from their use of the property he had conveyed. At least he had a commercial interest in the property. * * *"

Judge Coxe, writing for this court, affirmed the decree, holding that "no rational rule of damages can be formulated upon the facts as shown" and that there was no adequate remedy at law.

To allow rescission, the default must be such that it "destroys the essential objects of the contract," Rosenwasser v. Blyn Shoes, Inc., 246 N. Y. at page 346, 159 N. E. 84, 85, or it "must be so fundamental and pervasive as to result in substantial frustration." Buffalo Builders' Supply Co. v. Reeb, 247 N. Y. at page 175, 159 N. E. 899, 901.

In our opinion a rescission could only be decreed in the case at bar if there had been a gross failure to work the copyrights, which has nowhere been indicated. Moreover, such a drastic remedy as rescission has often been withheld, and an equitable lien upon the subject-matter involved has been substituted even where rescission might have been allowed. This is illustrated in various cases where conveyances of land have been made in consideration of maintenance and support. Rescission has sometimes been granted because of a fundamental breach of the contract on the part of the grantee. Russell v. Carver, 208 Ala. 219, 94 So. 128; Russell v. Robbins, 247 Ill. 510, 93 N. E. 324, 139 Am. St. Rep. 342; Maddox v. Maddox, 135 Ky. 403, 122 S. W. 201; Grant v. Bell, 26 R. I. 288, 58 A. 951; Sweeny v. Patton, 134 Va. 117, 113 S. E. 715. But in other cases the relief afforded has been through the imposition of an equitable lien upon the property conveyed, enforceable at the suit of the grantor. Stephens v. Daly, 49 App. D. C. 389, 266 F. 1009; Chase v. Peck, 21 N. Y. 581; Stehle v. Stehle, 39 App. Div. 440, 57 N. Y. S. 201; Webster v. Cadwallader, 133 Ky. 500, 118 S. W. 327, 134 Am. St. Rep. 470; Simmons v. Shafer, 98 Kan. 725, 160 P. 199; Patton v. Nixon, 33 Or. 159, 52 P. 1048; Abbott v. Sanders, 80 Vt. 179, 66 A. 1032, 13 L. R. A. (N. S.) 725, 130 Am. St. Rep. 974, 12 Ann. Cas. 898; Morgan v. Loomis, 78 Wis. 594, 48 N. W. 109. The Court of Appeals of Virginia said in Keister v. Cubine, 101 Va. 768, 45 S. E. 285, 286, when imposing a lien, instead of ordering a rescission and decreeing a reconveyance:

"The power of a court of equity in a proper case to rescind the contract and restore the property to the grantor would certainly include the power to afford a less dras-

tic relief, if the facts pointed to the latter as more consonant with justice."

In the case at bar, within a month after August 1, 1929, which was the date when royalty payments became due under the contract, and only about three weeks after the adjudication, the receiver called for bids and attempted to sell the copyrights. Any default in working the copyrights had not been long enough in itself to justify a rescission and the proposed sale cannot be said to have been an act that would "result in substantial frustration" of the composer's rights upon the record before us. We can see no justification for decreeing rescission unless the transfer of title to the bankrupt, "its successors and assigns," though absolute in form, be held as naught.

It may be that the songs, or some of them, are worth much more than when they were copyrighted, and it is not unlikely that a large part of their value is due to the labor and expense laid out upon them by the bankrupt as entrepreneur. The trustee in bankruptcy ought to be able to retain for the creditors these contributions to the copyrighted songs, as well as any fortuitous increment, if the right of the composers to receive royalties from working the copyrights can be reasonably safeguarded.

Whether or not the copyrights may have become burdened with equities in favor of the composers, their title is in the bankrupt estate. The assignments were absolute, and Waterson, Berlin & Snyder Company would have had no right to take out the copyrights had it not been the "proprietor" within the meaning of the Copyright Act. Public Ledger v. New York Times (D. C.) 275 F. 562.

In our opinion there is a middle course between the extreme doctrine of In re Grant Richards and Barker v. Stickney, supra, and the cases which have allowed rescission for failure to work a patent, which we should take in the circumstances here. In view of the absolute terms of the transfer, the presence of the word "assigns" in the instrument of conveyance, and the statutory requirement that one who takes out a copyright must be the "proprietor," we see no reason to imply a covenant that Waterson, Berlin & Snyder Company must itself publish the songs. The composers cannot object if the trustee sells the copyrights. In re Howley-Dresser Co. (D. C.) 132 F. 1002.

But it is a different matter to say that the sale of the copyrights should be free from all equities on behalf of the composers. In ordinary circumstances, and between the original parties, it may be that the only remedy of the composers would be an action at law for breach of the promise to pay royalties. Even between the original parties, rescission would be granted at the suit of the composers, if the publisher failed to work the copyrights in good faith, so that they might so far as possible yield royalties and thus afford the measure of compensation agreed upon. But, even where the publisher failed to work the copyrights, it could not be said that there would be actually no remedy at law, for the courts allow actions at law because of failure to observe such implied covenants. McIntyre v. Belcher, 14 C. B. (N. S.) 655. The damages for the breach of such a covenant, however, would necessarily be determined by estimates that at best could be no more than speculative substitutes for the definite royalties prescribed by the contracts. Accordingly a court of equity would decree a rescission where the breach was so fundamental as to amount to frustration, because the remedy at law would be inadequate. Neenan v. Otis Elevator Co., supra. A restrictive covenant affecting the use is imposed in such cases, and rescission is granted for failure to observe it.

It is true that the royalties on the songs are definitely provided to be paid only "in the event of the publication" by Waterson, Berlin & Snyder Company, but, where the words of assignment of the musical compositions are absolute, it is unreasonable to suppose that there may be no exploitation of the songs, except by Waterson, Berlin & Snyder Company. It seems to us equally unreasonable to suppose that the trustee may sell them free from all rights of the composers and thus deprive the latter of the only means of fixing the royalties which they have been promised. In our opinion, while the copyrights may be sold by the trustee, they should be sold subject to the right of the composers to have them worked in their behalf and to be paid royalties according to the terms of the contracts. This is in accordance with the analogy of such decisions as Lord Strathcona Steamship Co. v. Dominion Coal Co., [1926] A. C. 108; Werderman v. Societe Generale d'Electricite, 19 Ch. D. 246; Murphy v. Christian Press Ass'n Pub. Co., 38 App. Div. 426, 56 N. Y. S. 597; New York B.-N. Co. v. Hamilton, etc., Co., 83 Hun, 593, 31 N. Y. S. 1060; Great Lakes & St. Lawrence Trans. Co. v. Scranton Coal Co. (C. C. A.) 239 F. 603; Montgomery Enterprises v. Empire Theatre Co., 204 Ala. 566, 86 So. 880,

19 A. L. R. 987; Rider, Petitioner, 16 R. I. 271, 15 A. 72.

We can discover no justification for decreeing a rescission, as was done in De Bekker v. Stokes, 168 App. Div. 452, 153 N. Y. S. 1066, affirmed 219 N. Y. 573, 114 N. E. 1064, because the facts here do not warrant a remedy so extreme and so disastrous to the bankrupt estate. If the purchaser at the trustee's sale should fail to work any copyright that he purchased, when it was reasonably practicable to do so, rescission doubtless might be granted at the instance of the composer in some future suit. If the trustee shall be unable within a reasonable time to obtain a purchaser who will take title subject to the terms mentioned, the District Court should direct a reassignment of any copyright thus affected upon repayment of any unearned advance royalties upon such copyright. Rescission ought to be allowed only where there is manifestly no purpose to render the copyright productive to the composer. In the circumstances, the rights of the composers are satisfied by a sale subject to the obligation to work any copyright that may be sold, so far as may be reasonably practicable, and subject to the lien of any royalties accruing after the sale by the trustee and to the obligation to pay such royalties as provided in the royalty contract.

If a right to rescind the contract may be granted because of a fundamental breach of the implied obligation to work the copyrights, surely a lien may be imposed for royalties accruing through the use of the copyright by a subvendee, for in no other way can the right of a composer to receive royalties be preserved in a case where the publisher has parted with title. To impose a lien, rather than to deprive the estate of the bankrupt of all interest in the copyrights, follows the analogy of the support and maintenance cases which have imposed a lien instead of decreeing a rescission in situations where the more drastic remedy did not seem to be warranted. Stephens v. Daly, 49 App. D. C. 389, 266 F. 1009; Chase v. Peck, 21 N. Y. 581; Stehle v. Stehle, 39 App. Div. 440, 57 N. Y. S. 201; Keister v. Cubine, 101 Va. 769, 45 S. E. 285. Such relief is also within the analogy of numerous other decisions we have referred to. The obligation to pay royalties accruing under the contract after a sale by the trustee is justified by the opinion of Jessel, M. R., in the Werderman Case.

The order of the District Court is reversed, and the proceeding is remanded, with directions to enter an order in accordance with the views expressed in this opinion.