**FROEDTERT GRAIN & MALTING CO., Inc.
v. STEELCOTE MFG. CO.**

No. 6529(2).

United States District Court
E. D. Missouri, E. D.

March 23, 1953.

Moser, Marsalek, Carpenter, Cleary & Carter and G. W. Marsalek, of St. Louis, Mo., for plaintiff.

Edwards, Metcalfe & Strong and Walter L. Metcalfe, of St. Louis, Mo., for defendant.

HULEN, District Judge.

The record in this case presents this question: Plaintiff having used defendant's paint in its malt houses under a guarantee providing a remedy in case of failure to comply with the guarantee, and sustaining such a failure, is defendant's liability under the remedy provided in the written guarantee confined solely to furnishing additional paint? Plaintiff seeks recovery of cost of paint on the guarantee, and of cost of work based on negligence. We find against plaintiff on its negligence claim. Defendant[1] denies all liability because of

---

1. Plaintiff negotiated with a predecessor of defendant, but such fact is not material to the case.

alleged failure of plaintiff to give notice of failure and to demand of defendant that it furnish paint. We find notice was given defendant, demand was not required, and defendant is liable for cost of paint for its failure to furnish it as agreed.

### Facts

Plaintiff operates a malt manufacturing business in Milwaukee. It desired to paint the inside of two malt houses, without interference in its operation. In each malt house were a number of bins where the malt product was processed. There was conveying machinery for delivery of the product to the bins. The outside walls of the bins, the inside surface of the houses, and conveyor machinery were to be painted. These surfaces were at all times when the malt houses were being used, covered with varying degrees of moisture, from dampness to a density that flowed. The humidity in the malt houses was in excess of 90%.

Defendant manufactured a paint for damp walls called "Damp-Tex." Mr. Niedt, Vice-President of defendant company, inspected one of plaintiff's malt houses. He was told the other was "identical" to the one inspected. He represented that Damp-Tex could be used to paint the walls while wet, and that operations need not be interferred with. Mr. Niedt prepared specifications for use of Damp-Tex and accompanied the specifications with a letter, part of which reads:

"* * * when material is applied in accordance with these simple instructions we will guarantee Damp-Tex to give you at least three years' satisfactory service. Should it fail, we will agree to furnish you without cost sufficient Damp-Tex to repaint such surfaces."

After receiving the specifications and letter plaintiff made a contract with a paint contractor to do the work, using defendant's Damp-Tex.

The Damp-Tex was applied at a cost to plaintiff, including labor, in excess of $40,-000. The paint appeared to be satisfactory on completion of the work and for about a year thereafter. The paint then started to flake, peel and separate from the parts of the malt houses where applied. There was trouble of like nature with the paint on the conveyors in one of the houses within the year, but defendant claimed this trouble was due to manner of application. The Damp-Tex "did not give satisfactory" service for a three-year period and therefore failed to meet the guarantee of defendant.

Plaintiff completed the painting in the fall of 1944. There was substantial peeling at the end of a year from the time of application. By October of 1946, less than two years after it had been applied, defendant had notice of a substantial failure of the paint to comply with its guarantee, and was seeking the cause. The cause was never established. The paint was applied in accordance with the specifications. There is no proof of fault in the specifications or negligence in supervision by defendant. The paint did not meet the guarantee of defendant for use in plaintiff's malt houses because of some unknown condition on the wall surfaces; whether a chemical or temperature condition the record does not show. One wall, the other side of which was not exposed to outside temperature, developed less peeling than exposed walls.

### Pleading

The complaint charges:

"* * * the material applied to plaintiff's malt houses and manufactured by the predecessor company did not conform to the claims, representations and warranties made by said predecessor company through its agents and its promotional literature in inducing the plaintiff to use said material."

Relief is sought based on:

"* * * the failure of Damp-Tex to conform to the claims, representations and warranties made to the plaintiff by the predecessor company, the preparation of improper specifications by the predecessor company, or the negligence of Henry W. Strand as alleged in paragraph 13 hereof, or a combination of said causes * * *."

At the trial plaintiff's counsel informed the Court:

"The Court: I understood you to say in your opening statement that you

were not claiming any breach of warranty.

"Mr. Marsalek: * * * If I made that statement, it was inadvertent. Your Honor, were you given the impression it was not an action based on breach of warranty?

"The Court: Yes, I was.

"Mr. Marsalek: And my intention was that we had an action based on the paper which we have introduced in evidence, plus an action sounding in negligence, defendant's negligence."

The "paper" referred to (Plaintiff's Exhibit No. 5) is the letter which accompanied the specifications.

In plaintiff's brief we find these claims:

"If the Court therefore finds from the evidence that the paint peeled extensively within the three year warranty period (and there is no evidence contradicting that fact), plaintiff is entitled to the value of sufficient paint to re-do the germinating compartments."

"But over and above the replacement of the paint under the warranty, we contend that by its negligence, defendant has become liable for a much larger amount, for the loss foreseeable if the specifications were improperly prepared, or if the consultation service was uninformed or incompetent."

Defendant stands on the letter accompanying the specifications, asserting:

"* * * defendant's liability to plaintiff, if any, under said alleged guarantee would be limited to the furnishing of sufficient "Damp-Tex" to repaint surfaces on which "Damp-Tex" had been applied as provided by the specifications and on which there had been a failure;"

and claims plaintiff failed to make demand for execution of the terms of the letter:

"* * * nor has plaintiff at any time called upon defendant to furnish to it any paint in any amount to repaint any surfaces and that therefore any alleged right that plaintiff may at any time have had is barred by the Statute of Limitations;"

*Law*

I.

Bearing on plaintiff's claim of negligence in supervision it offered the testimony of Mr. Strand, an employee of defendant, to show inspection and direction, by defendant, in application of the paint by the contractor. Defendant objected to Strand's testimony as not binding because not within the purview of Strand's duties. We overrule defendant's objections to Strand's testimony.

Both parties lay stress on this point and argue the importance of Strand's testimony. We are not impressed. Regardless of Strand's duties, the record is barren of proof of fault in application of the paint. There is substantial evidence the paint was applied in accordance with the specifications. There is no evidence it was not—only speculation. Regardless of Strand's duties there is no evidence that any act or failure to act by him contributed to the failure of the paint in any way.

II.

Defendant prepared the specifications. Only a myth of suspicion attaches to the terms of the specifications. They were complied with. In no particular is it shown or attempted to be shown that the specifications were at fault. Plaintiff has the burden of proof of pointing to some defect in the specifications and then connecting such defect with the failure of the paint.

III.

We are left with plaintiff's claim based on the guarantee contained in defendant's letter of December 13, 1943, which accompanied the specifications. The guarantee reads:

"After examining your job, I am quite confident that if those specifications are carried out, you will get a most satisfactory paint job, and in line with my conversation, when material is applied in accordance with these simple instructions we will guarantee Damp-Tex to give you at least three years' satisfactory service. Should it fail, we will agree to furnish you with-

out cost sufficient Damp-Tex to repaint such surfaces."

■ Plaintiff has sustained its burden of proof that Damp-Tex did not meet this guarantee. Defendant failed to furnish any paint as it obligated itself to do.

■■ The writer of the guarantee testified at the trial that it "occurred" to him at the time of recommending Damp-Tex that "we might have come-backs on it". and "we were hesitant about furnishing the paint." No hesitancy is evidenced in the letter. Manifestly it is a general guarantee of the paint for three years. Defendant argues the extent of its liability under the guarantee is to furnish paint to recover surfaces where there was failure within the three year period and since no demand was made by plaintiff within the three year period to furnish paint it stands relieved of any liability under the guarantee. This contention of defendant would place on plaintiff the duty not only to give notice of failure but further to demand that more paint be sent. We find nothing in the contract placing this double burden on plaintiff. Plaintiff's obligation under the contract was satisfied when it notified defendant's salesman, Mr. Strand, of the failure of the paint to meet the guarantee, and certainly was satisfied when Mr. Strand forwarded this notice to the defendant.

The contract was specific as to defendant's obligation to "furnish" more paint in the event of failure within the three-year period. No conditions are attached to the blanket obligation. It is manifest that before defendant could furnish more paint it was necessary that he know how much paint was needed. Williston on Contracts stated:

"Wherever * * * a contract cannot be carried out in the way in which it was obviously expected that it should be carried out without one party or the other performing some act not expressly promised by him, a promise to do that act must be implied."

In Great Lakes & St. Lawrence Transp. Co. v. Scranton Coal Co., 7 Cir., 239 F. 603, 607, it is stated:

"Precedent can throw but little light on the sound interpretation of · such contracts, *especially as to implying unexpressed obligations:* each has its own individuality, its own background and surrounding circumstances. Words are only symbols, and at times, even in the most formal agreement, but elliptical expressions of the mutual understanding; the underlying mutual intent, sought by both parties to be clothed in the language used, must be ascertained; text, context, and extrinsic circumstances, including prior negotiations and relations, may be considered to enable the court to view the matter from the standpoint of the parties at the time of making the contract." (Emphasis added.)

When all circumstances are considered here we conclude that to "furnish" paint required a determination of the paint needed, and the most logical party to determine how much paint would be needed to replace areas that had failed was the defendant. Plaintiff was not in the paint business. To have impressed on it the duty of determining what paint had failed and what had not, and whether one or two coats would be needed, would have been to give it a duty which defendant was peculiarly qualified to perform. The contract being silent, we conclude the intention of the parties must have been that the duty to determine how much paint should be delivered to repaint peeled surfaces rested on the defendant. We do not think that this duty was discharged by defendant in writing to plaintiff and requesting plaintiff to prepare a diagram of the peeling surfaces. Defendant could not shift this duty to plaintiff and plaintiff was under no obligation to assume such duty; it rested with defendant. In the first instance plaintiff insisted that a representative of defendant inspect the premises. Mr. Niedt did so. Plaintiff was not qualified to determine the extent of failure, the cause, or the amount of paint needed. Defendant was under a duty to do this work when the paint failed, just as it had done when the paint was originally sold.

■ If defendant had performed its obligations under the contract it would have determined and furnished sufficient paint to plaintiff to repaint the areas which had failed on receiving notice of failure during the three-year period of the guarantee.[2]

## IV.

There were two malt houses painted. Each malt house had two floors or a total of four germinating compartments, where the failure of the paint occurred. Each of the germinating compartments is virtually identical, being approximately 150 feet in length and 150 feet in width and 15 feet in height. We conclude there would be 9,000 square feet in the four walls and 22,500 square feet in the ceiling. In addition to this there are six bins in each germinating compartment. Each bin has two walls 132 feet long and four feet high. In these 12 walls there are 6,336 square feet. The inside of these bins was not painted and does not enter into the computation. There were 16 beams in each compartment which supported the ceiling. These beams were 150 feet in length and one and a half feet in depth. The sides of these beams constitute additional surface. The bottom horizontal surface is included in the number of square feet in the ceiling. There are 7,200 square feet in these beams. There are 14 columns, 14 feet in height and four feet around the perimeter. (The evidence was that the columns in one malt house were square and round in the other, but in both cases the perimeter was about four feet.) Using these figures there would be 784 square feet in columns in each germinating room.

The total area in each germinating room is the square feet in the walls and ceiling, walls of bins, beams, and columns, or 45,820 square feet. There are four such rooms, i. e. a total area of 183,280 square feet.

Mr. Niedt testified that one gallon of Damp-Tex would cover about 300 to 400 square feet, and that 350 was average. He also testified that the area covered in applying the second coat would be about the same as the first coat. Dividing the total area by the number of square feet covered by one gallon gives a result of about 524 gallons for one coat, or 1048 gallons for two coats. Mr. Niedt further testified that it would require about 70 gallons to put two coats on the steel in each malt house, or 140 gallons plus 15 gallons of rust killer for both. This gives a total of 1,203 gallons required to repaint the four germinating rooms in the two malt houses.

Mr. Niedt gave the cost of Damp-Tex as $3.95 per gallon, less 20% discount to a dealer contractor such as was employed by plaintiff. The cost of 1,203 gallons of Damp-Tex at $3.95 per gallon, less 20%, would be $3,701.48. Plaintiff may settle and submit judgment for that amount, with costs.

2. The record very strongly suggests that the percent of failure within the three-year period was so great as not to justify a repaint job when cost of labor was balanced with the anticipated duration of the paint, based on experience. If such be a fact, however, it does not legally excuse defendant from performance under its contract, or from responding in damages for failure to perform.